**In re Frank J. GOODAVAGE, Donis L. Goodavage, Debtors.**

**Bankruptcy No. 84–00291–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 13, 1984.

Joyce S. Wade, Alexandria, Va., for debtors.

Gerald M. O'Donnell, Alexandria, Va., Trustee in Bankruptcy.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Bankruptcy Judge.

Frank J. and Donis L. Goodavage, debtors herein, filed a petition under Chapter 13 of the Bankruptcy Reform Act of 1978 ("the Code") on March 21, 1984, and a proposed plan for adjusting their debts on April 4, 1984. The sole secured creditor filed an objection to the proposed plan May 18, 1984. The Trustee in Bankruptcy objected to the plan at the May 22, 1984 confirmation hearing.

Debtors' plan proposes monthly payments of $206.68 for a sixty-month period. The monthly payment amount equals the surplus of debtors' net monthly income over their total monthly expenses. Under the plan, the trustee and the sole secured creditor would receive payment of 100% of their claims within approximately the first fifty-three and one-half months and the twenty-one unsecured creditors would receive payment of 10% of their claims in the last six and one-half months. The secured creditor filed an objection to the plan expressing its desire to repossess the security, a motor boat. The trustee objects to the plan as inadequately providing for the unsecured creditors and moves for conversion to Chapter 7. Trustee characterizes the proposed plan as a refinancing of debtors' boat and claims that it fails to meet the good faith proposal requirement under the Code.

Congress enacted Chapter 13 on the "premises ... that use of the bankruptcy law should be a last resort [and] that if it is used, debtors should attempt repayment under chapter 13." H.R. Rep. No. 95–595, 95th Cong., 1st Sess. 117–118 (1977), *reprinted in* Bkr–L Ed, LEGISLATIVE HISTORY § 82:4, 94–95 (1979), U.S. Code Cong. & Admin. News 1978, 5787, 6078. A Chapter 13 plan "shall" be confirmed by the court if six criteria are satisfied. 11 U.S.C. § 1325(a). The proponent of the plan bears the burden of proof as to its confirmation. *In re Wolff,* 22 B.R. 510, 512 (Bankr.App.1982) (per curium); *In*

*re Sellers,* 33 B.R. 854, 857 (Bankr.D.Colo. 1983). The only quantitative criterion for determining whether a plan adequately provides for an unsecured creditor is that such a creditor receive "not less than the amount that would be paid on [the allowed unsecured] claim if the estate were liquidated under Chapter 7 of this title on [the effective date of the plan]." 11 U.S.C. § 1325(a)(4). No assertion has been made that the proposed plan fails to satisfy this liquidation test. Trustee, however, claims that the good faith proposal requirement of section 1325(a)(3) requires more.

The Code does not define "good faith" and the legislative history of section 1325(a) is silent as to its meaning. However, nine of the twelve federal courts of appeals have construed the Chapter 13 good faith proposal requirement. The Chapter 13 plans considered by these courts provided for paying the unsecured creditors 0% to 11% of their claims. All nine appellate courts refused to find that Congress intended the good faith proposal requirement to impose any minimum payment test for Chapter 13 plans[1]. Instead, the courts have adopted reasoning similar to the Fourth Circuit's conclusion set forth in *Deans v. O'Donnell,* 692 F.2d 968 (4th Cir.1982):

the plain language of the statute precludes importation of a *per se* rule of substantial repayment into the "good faith" requirement in every case. Quite simply, had Congress intended that such

repayment be a condition precedent to confirmation of all Chapter 13 plans it could have explicitly so stated .... Congress did in fact explicitly set a minimum repayment level for unsecured creditors in § 1325[ (a)(4) (liquidation test) ], but that limit is not one requiring substantial repayment in every plan.

*Id.* at 970–71.[2]

Courts have developed various factors relevant to the good faith proposal determination. The *Deans* factors are common to those discussed by the other courts:

not only the percentage of proposed repayment, but also the debtor's financial situation, the period of time payment will be made, the debtor's employment history and·prospects, the nature and amount of unsecured claims, the debtor's past bankruptcy filings, the debtor's honesty in representing facts, and any unusual or exceptional problems facing the particular debtor.

692 F.2d at 972. One of these factors, "the period of time payment will be made," presents an important issue in the case at bar, in which debtors have proposed a sixty-month plan. The *Deans* court did not elaborate on or apply the duration factor, but considering duration of payment as an index of good faith necessarily implicates two other criteria for confirmation of Chapter 13 plans. Section 1325(a) requires, in addition to the plan being proposed in good faith, "that the plan [comply] with the pro-

---

**1.** *In re Hines,* 723 F.2d 333, 334 (3d Cir.1983) ("nominal" payments to unsecured creditors, 36-month plan)

*Public Finance Corp. v. Freeman,* 712 F.2d 219, 221 (5th Cir.1983) (0%, duration unknown)

*Flygare v. Boulden,* 709 F.2d 1344, 1347 (10th Cir.1983) (3%, 60 months)

*In re Kitchens,* 702 F.2d 885, 889 (11th Cir.1983) (per curiam) (10%, 29 months)

*In re Estus,* 695 F.2d 311, 316 (8th Cir.1982) (0%, 15 months)

*Deans v. O'Donnell,* 692 F.2d 968, 971 (4th Cir. 1982) (0%, 36 months)

*Barnes v. Whelan,* 689 F.2d 193, 198 (D.C.Cir. 1982) (1%, duration unknown)

*In re Goeb,* 675 F.2d 1386, 1389 (9th Cir.1982) (1%, 60 months)

*In re Rimgale,* 669 F.2d 426, 432 (7th Cir.1982) (11%, 42 months)

**2.** A number of courts have determined that just as good faith does not require substantial repayment, it does not require debtor's best efforts. *See, e.g., In re Kitchens,* 702 F.2d at 887–88; *In re Rimgale,* 669 F.2d at 432. Several courts have noted legislation proposed in the 96th Congress which would have added to § 1325(a)(3) or (4) the requirement that the proposed plan "represents the debtor's good faith [or bona fide] effort." Although the bill stalled, courts have cited the proposal as evidence that section 1325(a)(3) calls for application of only the traditional good faith test. *In re Estus,* 695 F.2d at 316 n. 11; *Barnes v. Whelan,* 689 F.2d at 199–200; *See* 5 *Collier on Bankruptcy,* ¶ 1325.01, at 1325–8.9 to 1325–8.13 (15th ed. 1983).

visions of this chapter" and that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. §§ 1325(a)(1), (6). Let us examine these two criteria.

Section 1322(c) requires that a plan "may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period." The Code does not define "for cause" but the underlying rationale is said to be clear in the legislative history.

> On the other hand in certain areas of the country inadequate supervision of debtors attempting to perform under the wage earner plans have (sic) made them a way of life for certain debtors. Extensions on plans, new cases, and newly incurred debts put some debtors under court supervised repayment plans for seven (7) to ten (10) years. This has become the closest thing there is to involuntary servitude....

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 117 (1977), U.S. Code Cong. & Admin. News 1978, 6078, *quoted in In re Poff,* 7 B.R. 15, 17 (Bankr.S.D.Ohio, E.D.1980); 5 *Collier on Bankruptcy,* ¶ 1322.01, at 1322–18 (15th ed. 1983). *Poff* is instructive on the practical implications of long-term plans.

In *In re Poff,* the plan at issue proposed a 50% payment to unsecured creditors in sixty months. 7 B.R. 15 (Bankr.S.D.Ohio, E.D.1980). In the view of the *Poff* court, "it may be only appropriate to consider confirmation of a plan where [sic] payments are proposed to last more than three years when that plan is an extension plan (100%), or a composition plan with a substantial dividend (at least 70%)." *Id.* at 17. The court offered two rationales for its view. First, that Congress intended Chapter 13 payments to be "meaningful, and perhaps substantial." *Id.* The second rationale is based on the "marginal" feasibility of long-term plans with a low payment percentage. *Id.* at 17–18. From the debtor's viewpoint, the plan allows "no room for post-petition modifications to accommodate changed circumstances and experience

has shown that such plans rest on a delicately balanced budget which is not likely to maintain its integrity over a five year period." *Id.* at 18. From the unsecured creditor's viewpoint, "[w]hat solace [can be taken] in receiving a 10% dividend on its claim in the fourth year and eleventh month after confirmation?" *Id.*

The *Poff* court might reconsider its first rationale in light of the rejection by nine federal courts of appeals of a substantial repayment requirement for Chapter 13 plans. The principle of marginal feasibility, however, is a concern underlying several *Deans* factors, including the debtor's financial situation and employment prospects and unusual or exceptional problems facing the debtor. Furthermore, feasibility is the principle of section 1325(a)(6), requiring for confirmation that "the debtor will be able to make all payments under the plan and to comply with the plan." 11 U.S.C. § 1325(a)(6). One source indicates that:

> The principal criterion to be satisfied in order to promote the prospects for success in Chapter 13 cases is that imposed by subsection 1325(a)(6)....
>
> ... The failure to take into account the particular circumstances and the capacity of each individual debtor to meet the proposed payments during the extended period of the plan was undoubtedly the most important contributor to the low completion rate of repayment plans under Chapter XIII.

5 *Collier on Bankruptcy,* ¶ 1302.-01[3][A][x] at 1302–12 to 1302–13, *citing Bankruptcy Act Revision: Hearings before the Subcomm. on Civil and Constitutional Rights of the Comm. on the Judiciary, House of Representatives, on H.R. 31 and H.R. 32,* 94th Congress, 2d Sess., pt. 3, 1327–28 (1976). Recognizing the importance of the feasibility requirement, a court determined a plan not to be feasible in view of the debtors' particular circumstances and considering that only a $9.00 cushion between debtors' monthly income and debtors' expenses existed after making the plan payments. *In re Belka,* 13 B.R. 607, 610

(Bankr.W.D.Mich.1981). Similarly, the court in *In re Guerrieri*, 10 B.R. 464 (Bankr.D.R.I.1981), found a plan not to be feasible because "[b]y putting their last pennies into the plan, the Debtors have left nothing for the contingencies with [sic] which we all face." 10 B.R. at 465.

■ Turning to the facts at hand, debtors propose to make payments under the plan for sixty months, the maximum allowable duration under section 1322(c). Debtors would thus be unable to request a temporary moratorium on payments or an extension of time for performance[3]. Furthermore, the monthly payment amount exactly equals the surplus of debtors' estimated future monthly income over their estimated future monthly expenses, leaving debtors no cushion to absorb unforeseen expenses. The combination of maximum duration and no cushion compels a careful look at other *Deans* factors. Two of these particularly relevant factors are the debtors' financial situation and unusual problems facing the debtors.

Debtors are in sales, the husband has been employed by his present employer for one year and the wife has been self-employed for three years. Together they take home $1,859.40 per month[4]. The wife also receives $230.00 per month for the support of one of two children living with debtors. The husband's current gross income, annualized, represents a 5.7% increase over his gross income for the last calendar year. The wife did not list her gross income for the last calendar year. Both husband and wife listed their employment as being subject to seasonal or other change[5]. Debtors' estimated future monthly take-home pay equals their current monthly take-home pay.

Debtors' schedules indicate that ten of their twenty-one scheduled unsecured debts are for medical expenses incurred over an unknown period of time in the amount of $2,927.31. This figure represents nearly one quarter of their total unsecured debt. This significant percentage indicates a substantial expense over which debtors obviously have no control. Because these expenses were incurred as debts, they could not have been covered by any health insurance policy. Debtors' projected budget includes $100.00 for medical and drug expenses which appears to be unrealistic considering the amount of past medical bills.

■ Based on all of the foregoing circumstances, the inescapable conclusion is that debtors will be strapped to their plan payments and their budget for the next five years. The inflexibility of debtors' plan is especially troubling in light of the seasonal nature of debtors' employment and their history of medical expenses. Under these circumstances, it must be determined that the plan is not feasible in that it "rest[s] on a delicately balanced budget which is not likely to maintain its integrity over a five year period." *In re Poff*, 7 B.R. at 18. Accordingly, confirmation is denied.

An appropriate Order will enter.

3. Debtors could request a post-confirmation modification of their plan under § 1329(a). Section 1329(b), however, provides that the plan as modified must meet the requirements of § 1325(a). In order to meet the § 1325(a)(5) standard with respect to the secured creditor in this case, monthly payments of $206.68 must continue for approximately fifty-three and one-half months. *See* 11 U.S.C. § 1325(a)(5)(B). The only modification which would satisfy § 1329(b), therefore, would be decreasing or eliminating the payments to the unsecured creditors. This modification would only reduce the total payment under the plan of $12,400.80 by the amount of $1,317.17. Nevertheless, post-confirmation relief available under § 1329 is of questionable relevance on the issue of confirmability itself.

4. The wife did not list wage deductions in her Chapter 13 Statement; therefore, $800.00 of the take-home figure actually represents gross wages.

5. There is no indication as to whether the husband's current monthly income is an averaged figure or represents earnings during a slack or peak period.