In re Bruce Lee SELLERS, aka Bruce L. Sellers, aka Bruce Sellers, dba L & S Sheep Account, dba B & S Livestock, dba L & S Livestock, dba L & S Sheep Company, Debtor.

Bankruptcy No. 81 B 0106 M.

United States Bankruptcy Court, D. Colorado.

Sept. 22, 1983.

Allen Schwartz, Fort Collins, Colo., for debtor.

Steven Francis, Fort Collins, Colo., for objecting creditor, Lowell Nygaard.

## MEMORANDUM OPINION AND ORDER

JAY L. GUECK, Bankruptcy Judge.

THIS MATTER comes before the Court on remand from the United States District Court for the District of Colorado. On January 12, 1981, the above named debtor filed a voluntary Petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 1301, et seq. A Plan was filed and subsequently amended. On May 11, 1981, this Court confirmed the Amended Chapter 13 Plan. Two creditors then appealed. In the interim between confirmation and resolution of the appeal, in an Order dated August 3, 1981, this Court directed the debtor to continue making payments in the amount called for in the Plan, but enjoined the Trustee from disbursing funds to creditors. On January 29, 1982, U.S. District Judge Weinshienk reversed the Order Confirming the Plan and remanded the case for further consideration of the requirement of good faith found at 11 U.S.C. § 1325(a)(3). She stated such determination should be made in light of the standards set forth in *In re Polak,* 9 B.R. 502 (D.C.Mich.1981), and *Matter of Kull,* 12 B.R. 654 (D.C.Ga.1981). Further proceedings were then instituted in the Tenth Circuit, and on April 27, 1982 that court dismissed the appeal, finding it was not based on a final order. Thereafter, the matter was returned to this court for determination of good faith pursuant to Judge Weinshienk's Order of Remand. A hearing was held in compliance with the Order of Remand on June 8, 1983 in this court.

██ Subsequent to Judge Weinshienk's reversal and remand, the United States Court of Appeals for the Tenth Circuit addressed the issue of good faith in *Flygare v. Boulden,* 709 F.2d 1344 (10th Cir.1983). There, the Tenth Circuit listed eleven factors deemed relevant to a determination of good faith and stated, "This list is not exhaustive, and the weight given to each factor will necessarily vary with the facts and circumstances of each case." *Flygare v. Boulden, supra,* at page 1348. The Court also quotes with approval from *In re Estus,* 695 F.2d 311 (8th Cir.1982), as follows:

"[T]he proper inquiry should follow the analysis adopted by the Fourth Circuit [*In re Deans,* 692 F.2d 968]: whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13. The bankruptcy court must utilize its fact-finding expertise and judge each case on its own facts after considering all the circumstances of the case. If, after weighing all the facts and circumstances, the plan is determined to constitute an abuse of the provisions, purpose or spirit of Chapter 13, confirmation must be denied." *In re Flygare, supra,* at page 1347.

With some variation, *Flygare, supra,* substantially incorporates the analysis of *Polak, supra,* and *Kull, supra.* Accordingly, I am called upon to examine the Amended Plan and supporting documentation, the transcript of the confirmation hearing before then-Bankruptcy Judge Moore, the numerous briefs filed in support of and in opposition to confirmation, and the evidence presented at the confirmation hearing held on June 8, 1983. This examination must be conducted in light of the factors set in *Flygare v. Boulden, supra,* and in light of the circumstances extant at the time of the original confirmation hearing, on April 10, 1981, upon which the Order of May 11, 1981 was based. The fundamental question to be determined is whether the proposed Plan is consistent with the provisions, spirit and purpose of Chapter 13.

The debtor's proposed Amended Plan called for payments of $260.00 per month for a period of 36 months. Pursuant to Court Order, the debtor has made 24 monthly payments without a default. Of course, at the time of the original confirmation hearing, there had been no opportunity to demonstrate this record of regular payments. If the Amended Plan is confirmed, *nunc pro tunc,* and the remaining plan payments are made, Sellers will be discharged in May of 1984, pursuant to § 1328(a) of the Code. Sellers has listed one priority and three allowed secured claims. The Amended Plan proposes to pay the Internal Revenue Service $694.52 through the Plan for 1979 unpaid income taxes. With respect to the allowed secured claims, Sellers proposes to pay the First National Bank in Wayne, Nebraska, $135.69 per month outside the Plan, and Citicorp Homeowners, Inc. the sum of $214.13 per month outside the Plan. GMAC will be paid through the Plan at a capitalization rate of 15.76%. While it is noted that a 15.76% capitalization rate is very high when compared to Plans offered at this time, such capitalization rate was not uncommon when the proposed Amended Plan here was originally presented in March, 1981. Sellers proposes to discharge $69,037.58 of allowed unsecured claims by paying the claimants $1.00 each through the Plan.

The objecting creditor is Lowell James Nygaard (hereinafter "Nygaard"). Nygaard holds an allowed unsecured claim for $11,621.00. His objection focuses on two aspects of Sellers' Plan. First, Nygaard contends that the debt owed to him would not be dischargeable in a Chapter 7 liquidation because he alleges the debt to be a product of actual fraud perpetrated by Sellers. Secondly, Nygaard argues that the good faith standard requires some meaningful repayment to unsecured creditors. Nygaard urges that, for either of these reasons, the Plan has not been proposed in good faith.

In undertaking a review of the factors set forth in *Flygare, supra,* it is noted that certain facts have changed since the Amended Plan was originally presented and confirmed. I do not consider those changed circumstances to be as material as the circumstances which were in existence at the time of the effective date of the Plan. Confirmation should be determined by the contents of the Plan as of the effective date of the Plan. See, 11 U.S.C. § 1325. The Chapter 13 Plan was originally proposed on March 10, 1981. Payments then proceeded under that Plan after it was confirmed on May 11, 1981. By Order of August 3, 1981, the debtor was directed to continue making payments pursuant to that Plan during the period of appeal. Thus, it is my determination that the "effective date of the Plan" is

the date of the original confirmation, which is May 11, 1981.

Sellers filed his original budget and original Chapter 13 Plan on February 2, 1981. He listed his monthly take-home pay at $701.80. When the hearing was held on April 20, 1981, Sellers had changed employment and was earning roughly $1,012.00 per month take-home pay for a 4-week period. His wife's income was listed as $525.84 per month. Family expenses were estimated at $960.07 per month. The original Chapter 13 Plan filed on February 2, 1981, which called for payments of $255.56 per month to the Trustee, was amended on March 10, 1981 to increase those payments to only $260.00 per month, leaving an uncommitted surplus per month, at the time of confirmation, of over $300.00. This surplus could have been contributed to the Plan, but no such offer of contribution was made by Sellers. At the time of the last hearing, on June 8, 1983, Sellers' take home pay was approximately $1,150.00 per month.

 The expenses experienced by Sellers were approximately the same on June 8, 1983, as they were on April 10, 1981, except that the lot-rent for his trailer has increased $30.00 per month. Sellers' wife, who has not filed for bankruptcy, has experienced an increase in income from $525.84 per month to a monthly income of $950.00. The resultant changes, including overtime, taxes, monthly expenses and salary increase appear from the evidence to indicate the debtor's monthly surplus, before contribution to the Plan, has risen from approximately $267.00 when the original Plan was filed to approximately $577.00 on the date of the original confirmation hearing on April 10, 1981, to an excess of over $1,000.00 at the time of the last hearing, on June 8, 1983. This includes consideration for the wife's income, which, according to *Kull, supra,* should be included.

However, Sellers contends that he and his wife are about to separate, and, if this occurs, the monthly surplus will fall to $35.00 after deductions and adjustments for his wife's income and expenses. Mr. Sellers testified that most of his debts were incurred solely by him prior to his marriage; hence, Sellers argues that he cannot devote any more income to the Plan because of an impending divorce and resultant lower monthly surplus. No divorce has yet been filed.

I have considered the budget on file, which is the budget in existence at the time the amended Plan was proposed in 1981. I have also considered the factual changes noted above and have also considered the circumstance that the capitalization rate afforded secured creditors in other cases is now approximately 10 to 12 percent rather than the 15.75% provided in Sellers' Plan. I have also given little consideration to the possible impending divorce, since it would be pure speculation to examine the Plan under that assumption at this time and certainly not a factor to be considered under the record established in 1981. If the debtor is divorced at a later date, or other circumstances are dramatically changed, provisions exist for a post-confirmation modification pursuant to motion under 11 U.S.C. § 1329. A recitation and application of the factors set forth in *Flygare v. Boulden, supra,* is appropriate, keeping in mind the debtor has the burden of proof on the issue of confirmation of his Chapter 13 Plan. *In re Wolff,* 22 B.R. 510 (9th Cir. Bkrtcy.Pan.1982); *In re Elkind,* 11 B.R. 473 (Bkrtcy.Colo.1981).

First, the debtors' proposed monthly payment under the Amended Plan is $260.00, and the monthly surplus of income is now over $1,000.00. The surplus at the date of the original confirmation hearing was then over $575.00. The payment of $260.00 per month into a Plan out of a surplus of over $575.00, when the debtor proposes to pay unsecured creditors $1.00 each is a niggardly contribution. The argument that this is the best the debtor can do in light of a possible impending divorce is of little persuasive effect, especially since there was no such record of any pending divorce action at the time of the original confirmation hearing.

Second, the debtor's employment history, ability to earn and likelihood of future in-

creases in income reflect that he is a light-equipment operator for an excavating company with a trend of modestly increasing income. He has experienced periods of unemployment, but his employment history and likelihood of continued future advances was good even in 1981.

Third, the duration of the Plan is three years. The Court in *In re Estus, supra,* sheds some light on this factor when it stated:

> "The debtor's plan is scheduled to run for only fifteen months instead of the more common period of three years. This proposal to pay for only a limited time seems to relate with particularity to repaying only the secured creditors in full, or, in the case of a mortgage, to the point at which payments are current." *In re Estus, supra,* at page 317.

In this case, the debtor has proposed a three year plan, which is not uncommon. He could have sought to extend the Plan for up to five years, for cause, under 11 U.S.C. § 1322(c), but he did not choose to do so. This is not to say debtors in three-year "dollar" plans must always apply for an extended period if it would result in greater payments to unsecured creditors; but under the circumstances here, this is a factor I have considered.

Fourth, the accuracy of the Plan's Statements of Debts, Expenses and Percentage Repayment has not been disputed. Although the debtor has experienced changes in income and expenses, there is no indication such changes were a result of attempts to mislead the court. Indeed, the debtor freely admitted at the original confirmation hearing that he had experienced a substantial increase in income since his original budget. He simply didn't commit it to payments into the Plan.

■ The percentage of repayment to unsecured creditors is parsimonious. At $1.00 each, the percentage varies from a Scheduled disputed debt to Farmers & Ranchers Livestock Commission Co., Inc. of $26,547.15 (.0038%), Nygaard's claim of $11,621.95, plus interest (.0086%) to a Scheduled debt to Dr. Robert H. Pike of $82.16 (1.2%).

The discharge of these claims for $1.00 each, given the large monthly surplus available, and other concerns expressed herein, raises serious questions as to good faith.

■ Fifth, Nygaard argues that the Plan prefers certain creditors because it proposes to pay secured claims as a class 100% of their claim and unsecured claims as a class $1.00 each. The "classes of creditors" referred to in *Flygare* is not limited to a consideration of secured creditors as one class and all unsecured claims as another class. There may be different classes of unsecured claims. Where that is the case, consideration should be given to whether there is preferential treatment, and the extent of such treatment, between those classes of creditors. This result is supported by a close reading of the Code and an understanding of the difference in constitutional protection afforded to secured and unsecured creditors. It is noted that § 1322(b)(1) provides that unsecured claims may be classified. This same section infers that there may be discrimination between such classes. However, the debtor "may not discriminate *unfairly* against any class so designated; . . ." (emphasis supplied). No reference is made to classifying secured claims in Chapter 13. (Compare § 1122, which authorizes classification of claims in Chapter 11). Here, all unsecured creditors are of one class. It may well be an argument can be made they should not be contained within the same class in light of § 1122(b), which is incorporated within § 1322(b)(1). That provision allows the designation, as a separate class, of all unsecured claims that are less than or reduced to an amount approved by the Court as reasonable and necessary for administrative convenience. No argument in this regard has been presented. It may also be argued that unsecured creditors here are not being provided the same treatment within their class, as required by § 1322(a)(3), because, at $1.00 each, some are receiving greater percentage repayments than others. However, that argument has not been made either. This is a different consideration than that of determining "good faith" un-

der § 1325(a)(3). To the extent such dissimilarity in treatment among members of the same class may bear on the issue of good faith here, it is my determination that such dissimilarity is *de minimis* at the level of $1.00 each.

■ With respect to the difference in treatment by virtue of full payment to secured claims while unsecured claims receive the minimum dollar payment, there is good reason and precedent for such preference. Secured claimants, by virtue of their property interest in estate property, are entitled to be preferred over unsecured claimants. *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593, 97 A.L.R. 1106 (1935); *In re American Kitchen Foods,* 2 B.C.D. 715 (Bankr.Me. 1976).

Sixth, secured claims are not modified to any great extent by this Plan. The debtor proposes to pay the secured claims in full outside the plan without varying the respective contractual terms. The GMAC claim is to be paid through the Plan at a capitalization rate of 15.76%. This creditor has not objected to confirmation.

■ Seventh, Nygaard asserts that the debt owed to him by Sellers is a product of actual fraud and, therefore, would not be dischargeable in Chapter 7. See, § 727(b), § 523(a)(2) and § 103(a). Ordinarily, a specific finding of fraud must be made to hold debts non-dischargeable under § 523, and the fraud must be established by clear and convincing evidence. *Matter of Newmark,* 20 B.R. 842 (Bkrtcy.N.Y.1982). In my view, the extent to which fraud is established at the confirmation hearing is an additional factor to be weighed in the totality of circumstances approach set forth in *Flygare.* In this case, Judge Moore did make a specific finding, under the then-existing criteria, that the filing of the Chapter 13 Petition was not the culmination of a fraudulent scheme to misuse the Bankruptcy Code. However, there was sufficient evidence in the record to demonstrate that Nygaard's debt might well be found to be the product of fraud if litigated in a Chapter 7 action.

This evidence should weigh in the determination of good faith under *Flygare.*

Eighth, there do exist some special circumstances which might be considered in favor of, and against, confirmation. The debtors continuing timely monthly payments made pursuant to Court Order since confirmation is now demonstrated in the record. However, this did not occur until after the original confirmation was entered on May 11, 1981. It is not remarkable that such continuing monthly payments should be demonstrated, inasmuch as the payment is only in the amount of $260.00 and the monthly surplus is over $1,000.00. That surplus was in excess of $575.00 at the time of the hearing on confirmation on April 10, 1981. However, in Sellers' favor, the record reflects that he made pre-bankruptcy efforts to repay Nygaard. Sellers stated that he repaid part of the debt and worked for Nygaard to reduce the remaining indebtedness. Sellers even attempted to secure financing to repay Nygaard. Other "special circumstances", to the extent they may exist, have previously been discussed herein.

Ninth, Sellers has not previously availed himself of the protections of the Bankruptcy Reform Act.

Tenth, I find Sellers to be basically honest in seeking Chapter 13 rehabilitation, but not totally sincere in accomplishing repayment. He stated that he proposed a Plan under Chapter 13 to save his mobile home and vehicle and to satisfy a priority claim owed to the IRS. These are goals of Chapter 13, to achieve repayment and rehabilitation. House Report No. 95–595, to accompany H.R. 8200, 95th Cong. 1st Sess. (1977), pages 117–118; U.S.Code Cong. & Admin. News 1978, 5787, 6077–6079. Additionally, Sellers did not make an effort to hide the increase in income which he experienced at the time of the original confirmation hearing. He simply, quite candidly, elected not to use any of the surplus for the Plan. I do not find that Sellers' expressed concern about divorce and the potential financial reverses attendant thereto were uttered simply for the purpose of gaining acceptance of his amended Chapter 13 Plan, as

presented to the Court. Rather, I find such concern is not sufficient reason for failing to utilize his surplus in contributing to the Plan. I also find his sincerity in failing to diligently accomplish as much repayment as possible is lacking.

Eleventh, I do not perceive any serious burden that administration of this Plan would place on the Trustee. The Trustee is not required to do anything unusual that is not presented in other plans. The Trustee has not appeared in this proceeding to voice concern over administrative burdens.

 In the final analysis, I must determine if the Plan submitted, under all the circumstances discussed herein, constitutes an "abuse of the provisions, purpose or spirit of Chapter 13." In my view, Congress intended for debtors in Chapter 13 to achieve the benefits of that Chapter only if the debtor demonstrates a realistic and diligent effort at both repayment and rehabilitation, consistent with his or her own circumstances at the time of confirmation. See House Report No. 95–595, *supra,* and U.S.Code Cong. & Adm.News 1978, 5787, *supra.* Anything short of this is an abuse of Chapter 13.

In this particular case, the scales weigh against confirmation. The surplus was too great when compared to the proposed Plan payments, even on April 10, 1981. Not only was no suggestion made by the debtor to extend payments beyond three years, but also no reason was given for failure to commit a greater share of the surplus toward payments under the Plan. The percentage of payment to unsecured creditors is infinitesimal, although the debtor could afford them better treatment. Nygaard's debt appears to be one which would be non-dischargeable in Chapter 7. It is not unusual for debtors to take advantage of the more liberal discharge provisions of Chapter 13 over those of Chapter 7, and no court has held this, alone, to be indicative of a lack of good faith. Nevertheless, I cannot conclude that Congress intended such debts to be so blithely discarded under the circumstances herein presented. On balance, because of the concerns expressed herein, I simply cannot say that Sellers' Plan has been proposed in accord with the spirit, provisions and purpose of Chapter 13.

THEREFORE, confirmation of the Amended Plan, as proposed, is denied. The debtor has ten days within which to dismiss the action, convert to a Chapter 7, or file an Amended Plan responsive to the concerns expressed herein.