In re Thomas J. (Jerry) ROSE, Debtor.

Bankruptcy No. 2-89-01015.

United States Bankruptcy Court,
S.D. Ohio, E.D.

June 29, 1989.

Stephen E. Schafer, Columbus, Ohio, for debtor.

Michael J. Barren, Porter, Wright, Morris & Arthur, Columbus, Ohio, for The Huntington Nat. Bank.

Frank M. Pees, Worthington, Ohio, Chapter 13 Trustee.

Charles M. Caldwell, Columbus, Ohio, Asst. U.S. Trustee.

## OPINION AND ORDER ON OBJECTION TO CONFIRMATION

R. GUY COLE, Jr., Bankruptcy Judge.

### I. *Preliminary Statement*

This matter is before the Court upon an objection, filed by the Huntington National Bank ("HNB"), to confirmation of the Chapter 13 plan proposed by Thomas J. Rose ("Debtor"). The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this judicial district. The matter at bar is a core proceeding which the Court may hear and deter-

mine in accordance with 28 U.S.C. § 157(b)(1) and (2)(L). The following opinion and order shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

Debtor's proposed plan provides for quarterly payments of $2,700 over a 57-month time period; full payment of allowed, priority, unsecured claims; and a dividend of 70% to holders of allowed, general, unsecured claims. HNB, one of two creditors set forth in the schedules accompanying Debtor's petition, is listed as the holder of a claim arising from a criminal restitution obligation of the Debtor (the "Criminal Restitution Obligation"). HNB has filed a proof of claim in the amount of $68,285.61. The other creditor, the Internal Revenue Service, is scheduled as the holder of a $962.79 priority tax claim.

## II. Factual Background

Between 1974 and August of 1981 Debtor was the owner and operator of Rose Title Agency ("RTA") and Federated Mortgage, and was also a partner in Gibralter Land Title. Each of these entities[1] maintained banking accounts with HNB. During this time period, Debtor served as title agent for M/I Homes, a sizable Columbus-based real estate developer. In the course of Debtor's business, large sums of money routinely were deposited in the aforementioned HNB accounts.

While the record is unclear as to many of the facts preceding the Criminal Restitution Obligation, it appears that Debtor, in July of 1981, drew on an unspecified bank account a check payable to RTA in the amount of $47,000 and presented the check to HNB. The proceeds of this check were credited to an account maintained by RTA with HNB. Thereafter, Debtor drew, and HNB honored, numerous checks against this account. Subsequently, the $47,000 check was returned to HNB unpaid because the account upon which the check was drawn contained insufficient funds. Debtor apparently admitted that he knew, when he drew the $47,000 check, that the check would be dishonored upon present-

ment by HNB. Because the check was returned to HNB unpaid, Debtor's account with HNB became substantially overdrawn.

At or about this same time, Debtor obtained $3,850 from Society Bank "by false pretenses, false representations and/or actual fraud." HNB Ex. 1 (identified below as the "Restitution Agreement") at 1. Debtor obtained an additional $67,236.27 from Berks Title Agency, Inc. ("Berks") "by fraud or defalcation while acting in a fiduciary capacity, by embezzlement and/or larceny." Id. The particular circumstances surrounding Debtor's criminal conduct involving Society Bank and Berks is not revealed by the record.

As a result of the transactions described above, Debtor was criminally charged in state court with theft, and subsequently pleaded guilty to one count of that charge. Debtor attributes his criminal conduct to an addiction to alcohol and cocaine from 1979 to August of 1980. In August of 1980 Debtor entered, and apparently successfully completed, a substance-abuse rehabilitation program at Riverside Methodist Hospital. Debtor presently attends programs sponsored by a nationally-recognized alcohol abuse organization and maintains his sobriety.

Following entry of a guilty plea to the theft charge, the state court placed Debtor on probation. Debtor either was required as a condition of his probation, or consented, to enter into an agreement (the "Restitution Agreement") with Society Bank, Berks and HNB, pursuant to which Debtor would repay in installments his obligations to these creditors. Pursuant to the terms of the Restitution Agreement, HNB and Berks would receive payments only after the debt to Society Bank had been satisfied in full. Thereafter, payments made by the Debtor were to be applied equally to the debts owed Berks and HNB until the respective obligations were fully satisfied.

In 1983, during the term of Debtor's probation and while he was making pay-

---

**1.** Because each of the three entities listed above was either owned or operated by the Debtor, such entities, for the sake of simplicity, are collectively referred to as "Debtor."

ments pursuant to the Restitution Agreement, Debtor filed a joint voluntary petition under Chapter 7 of the Bankruptcy Code together with his wife, Polly Rose, from whom he is now divorced. Debtor thereafter entered into a stipulation ("Stipulation") with HNB in his Chapter 7 proceeding, which provided that the full amount of the obligation owed HNB under the Restitution Agreement was a nondischargeable debt in his bankruptcy case. Debtor and HNB further stipulated that the Criminal Restitution Obligation arose from Debtor's willful, malicious and fraudulent conduct. Paragraph 9 of the Stipulation specifies the amount of the obligation and the interest to be charged, as follows:

> Rose's obligation pursuant to the Restitution Agreement remains wholly unsatisfied, and accordingly Rose, on account of his fraudulent actions, owes Huntington the sum of Forty–Seven Thousand and 00/100 Dollars ($47,000.00), together with interest thereon at the rate of eight percent (8%) per annum from November 16, 1981.

Similar language was incorporated into a judgment entry (the "Judgment Entry") executed by former Bankruptcy Judge Kelleher on February 21, 1984.

Debtor made all payments called for under the Restitution Agreement until his probation terminated in February of 1987. Debtor then contacted HNB and proposed a restructuring of the Restitution Agreement. Specifically, because Berks had ceased doing business, Debtor requested that HNB credit all future payments made under the Restitution Agreement to its claim and none to the claim held by Berks. Because his requests to restructure the Restitution Agreement were unsuccessful, Debtor obtained legal counsel to assist him in his negotiations with HNB. Debtor expended considerable time and expense, including attorney's fees of $6,000 for the month of January, 1989, in attempting to renegotiate the terms of the Restitution Agreement.

Debtor and HNB were unable to reach an agreement for the restructuring of the Restitution Agreement. The primary issue in dispute—which precluded a successful renegotiation—involved whether the amount to be paid HNB should include interest charges from November 16, 1981. HNB, apparently on the strength of the Stipulation and Judgment Entry, took the position that interest from November 16, 1981, was properly includible in the amount it should receive under a restructured restitution agreement. Debtor took the contrary position—*i.e.*, the restructured payment obligation should not include interest charges from November 16, 1981.

Debtor's post-probation employment is germane to the issues before the Court. Upon termination of his probation Debtor accepted a position as an Executive Vice President with Leader Mortgage Company ("Leader") in Cleveland, Ohio, and earned approximately $75,000 in calendar year 1987. In 1988 Debtor, because of the alleged stress incumbent in his executive position, requested and obtained a job as office manager in Leader's Columbus operation. As office manager, Debtor earned approximately $20,000 in 1988, considerably less than he had earned the previous year as a vice-president.

Debtor left Leader and, since October 1, 1988, has been employed by First Mortgage Group, a small mortgage company which commenced doing business in September of 1988. Debtor receives a bi-weekly salary of $2,000 and is entitled to receive commission income on a quarterly basis. According to Debtor's Chapter 13 statement, he anticipates earning quarterly commission payments of approximately $4,500–$5,000. Debtor also receives a monthly automobile allowance of $325 and an "expense" allowance of $100 per month.

Debtor's income to date has not met his expectations. He received aggregate commission payments of $2,200 for the months of October, November and December of 1988. For the period between January 1 through February 21, 1989, Debtor has earned no commission income. The record is silent as to whether Debtor has earned any commission income since February 21. Debtor attributes the absence of commission income to several factors. First, be-

cause First Mortgage Company is a fledgling company, much of his time has been spent in "start-up" activities which have yet to provide financial reward. Further, Debtor claims that his attention to the dispute with HNB has distracted him and, thus, resulted in lost productive time. Debtor steadfastly maintains, nonetheless, that quarterly commission earnings of $4,500–$5,000 are a realistic expectation.

Debtor remarried in December of 1987. Because Debtor's criminal record has made it difficult for him to obtain credit, he and his wife have recorded the ownership of their residence and the vehicle which Debtor drives (a 1986 GMC Jimmy Pick–Up Truck) in his wife's name. However, even though Debtor did not sign the promissory notes for the purchase of the residence or automobile, he has made the payments on these obligations, at least in part, from his earned income.

It bears notation that, notwithstanding Debtor's receipt of a substantial salary in 1987, he made no payments to HNB that year. In fact, no voluntary payments under the Restitution Agreement have been made since his probation terminated in February of 1987. Those payments obtained by HNB from Debtor were secured through court-sanctioned wage and non-wage garnishments.

### III. Legal Discussion

#### A. Introduction

According to HNB, Debtor's plan should not be confirmed for the following reasons:

(1) the plan has not been proposed in good faith as mandated by 11 U.S.C. § 1325(a)(3);

(2) the plan is not feasible and therefore fails to comply with 11 U.S.C. § 1325(a)(6);

(3) the plan fails to meet the disposable income test of 11 U.S.C. § 1325(b); and

(4) Debtor's improper inclusion of the Criminal Restitution Obligation in the plan renders it unconfirmable.

Each of the bases underlying HNB's objection shall be discussed below.

#### B. Burden of Proof

As proponent of the plan, Debtor bears the burden of proving that the requisite tests for confirmation have been met. *In re Wolff,* 22 B.R. 510 (Bankr. 9th Cir. 1982); *In re Crago,* 4 B.R. 483 (Bankr.S.D. Ohio 1980); *In re Elkind,* 11 B.R. 473 (Bankr.D.Colo.1981); *Matter of Ponteri,* 31 B.R. 859 (Bankr.D.N.J.1983); *In re Sellers,* 33 B.R. 854 (Bankr.D.Colo.1983); *In re Smith,* 39 B.R. 57 (S.D.Fla.1984); *In re Hogue,* 78 B.R. 867 (Bankr.S.D.Ohio 1987). Thus, Debtor must persuade this Court that his proposed plan meets the statutory bases for confirmation contained in 11 U.S.C. § 1325.

#### C. Good Faith

In order for a Chapter 13 plan to gain confirmation under the Bankruptcy Code, it must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1325(a)(3). Good faith, in its traditional sense, is essential to the confirmation of every Chapter 13 plan. *Matter of Davis,* 68 B.R. 205, 209 (Bankr.S.D.Ohio 1986); *In re Pierce,* 82 B.R. 874, 880 (Bankr.S.D. Ohio 1987). According to HNB, Debtor's plan has not been proposed in good faith and therefore should not be confirmed.

HNB asserts that the Sixth Circuit's decision in *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982), precludes confirmation of Debtor's plan unless full payment of HNB's claim is proposed. The *Memphis Bank* decision involved a debtor whose pre-plan conduct in obtaining an automobile loan (*i.e.,* "puffing" of her income on a loan application) was characterized as "questionable" by the court. In grappling with the issue of how a bankruptcy court should treat questionable, pre-plan conduct, the Sixth Circuit stated: "Another way to deal with the problem when the conduct is questionable but is not shown to be dishonest … is to require full payment in accordance with the contract." 692 F.2d 432. The court also ruled that where the debtor's pre-plan conduct in incurring debt is dishonest the bankruptcy court should deny confirmation of the debt-

or's Chapter 13 plan. *Id.* According to HNB, because the Criminal Restitution Obligation arose from dishonest conduct on Debtor's part, *Memphis Bank* mandates denial of confirmation and dismissal of the case or, alternatively, full payment of HNB's claim.

Following the Sixth Circuit's decision in *Memphis Bank,* there was some apparent uncertainty in the lower courts as to the rule of law articulated in that case. The Sixth Circuit has recently restated—and perhaps clarified—its holding in *Memphis Bank. See Metro Employees Credit Union v. Okoreeh–Baah (In re Okoreeh–Baah ),* 836 F.2d 1030 (6th Cir.1988). In *Okoreeh–Baah,* the debtors obtained a $3,300 loan from a credit union in order to purchase a 1983 Volvo automobile. The debtors previously had borrowed the sum of $8,000 from the same credit union, which perfected its security interest by the notation of its name on the title of a 1981 Oldsmobile. In extending the second loan to the debtors, the credit union released the lien on the Oldsmobile and assumed, for whatever reason, that the debtors would independently record the title to the Volvo and ensure that the credit union's lien was noted thereon. Shortly after obtaining the second loan, the debtors' financial difficulties required them to obtain a bank loan, pledging the same automobile—the Volvo—and other property as collateral. Within six months of the date debtors obtained the loan from the bank, they informed the credit union that they had failed to perfect the credit union's lien on the Volvo and that they had subsequently pledged that automobile as collateral for the bank loan. Approximately four months later, the debtors filed a Chapter 13 petition.

The debtors' Chapter 13 plan, which provided less than a 100% dividend to holders of allowed unsecured claims, was denied confirmation by the bankruptcy court. The court's decision, affirmed by the district court, interpreted the *Memphis Bank* opinion to mandate two requirements: first, that if a debtor's pre-plan conduct is found to be questionable (not dishonest), then a requirement of repayment to the creditor

automatically takes effect without evaluation of the debtor's other, possible mitigating circumstances; and second, that the required repayment, once questionable conduct is found, must constitute 100% of the debt, and no less. It was the bankruptcy court's opinion that consideration solely of a debtor's pre-plan conduct, and not his total circumstances, was required by *Memphis Bank.* In reversing the district court, the Sixth Circuit explained its ruling in *Memphis Bank,* stating as follows:

It seems clear that this court did not mean to adopt a rule requiring 100% payment any time "questionable pre-plan conduct" exists, without analyzing any of the debtor's other circumstances. Indeed, if the Sixth Circuit had intended to announce a test using "questionable pre-plan conduct" as its only balancing factor, this court certainly would not have cited *Matter of Kull,* 12 B.R. 654 (S.D.Ga.1981), *aff'd sub nom. In re Kitchens,* 702 F.2d 885 (11th Cir.1983), in support of its position. The *Kull* court held that "good faith" required a subjective analysis of the "totality of the debtor's circumstances," and listed a variety of factors "which the bankruptcy court must consider, but not be limited to" when decided [sic] whether to confirm a debtor's bankruptcy plan.

. . . .

It is apparent to us that this court in *Memphis* was merely offering possible avenues of recourse to courts dealing with debtors who have engaged in dubious pre-plan conduct.

. . . .

The cases applying the principle set forth in *Memphis* emphasize that a debtor's pre-petition conduct is but one element in the debtor's total circumstances; the good faith calculus requires the use of discretion by the bankruptcy judge.

. . . .

Good faith is an amorphous notion, largely defined by factual inquiry. In a good faith analysis, the infinite variety of factors facing any particular debtor must be weighed carefully. We cannot here promulgate any precise formulae or mea-

surements to be deployed in a mechanical good faith equation. The bankruptcy court must ultimately determine whether the debtor's plan, given his or her individual circumstances, satisfies the purposes undergirding Chapter 13: a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources. The decision should be left simply to the bankruptcy court's common sense and judgment.

Accordingly, we hold that *Memphis* did not establish a *per se* rule, and that courts should take into account the totality of the circumstances confronting a debtor, not simply his or her pre-plan conduct, when deciding whether or not to confirm a Chapter 13 plan.

836 F.2d at 1032–34 (footnotes omitted).

In espousing a good faith analysis which looks to the "totality of the debtor's circumstances," the *Okoreeh–Baah* court adopted the twelve-factor inquiry postulated by the bankruptcy court in *Kull*. 836 F.2d at 1032 n. 3. The factors listed include the following:

(1) the amount of income of the debtor and the debtor's spouse from all sources;

(2) the regular and recurring living expenses for the debtor and his dependents;

(3) the amount of the attorney's fees to be awarded in the case and paid by the debtor;

(4) the probable or expected duration of the Chapter 13 plan;

(5) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

(6) the ability of the debtor to earn and the likelihood of future increase or diminution of earnings;

(7) special situations such as inordinate medical expense, or unusual care required for any member of the debtor's family;

(8) the frequency with which the debtor has sought relief under any section or title of the Bankruptcy Reform Act or its predecessor's statutes;

(9) the circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealing with his creditors;

(10) whether the amount or percentage of payment offered by the particular debtor would operate or be a mockery of honest, hard-working, well-intended debtors who pay a higher percentage of their claims consistent with the purpose and spirit of Chapter 13;

(11) the burden which the administration of the plan would place on the trustee; and

(12) the salutary rehabilitative provisions of the Bankruptcy Reform Act of 1978 which are to be construed liberally in favor of the debtor.

*Kull*, 12 B.R. at 659. Subsequently, in *Hardin v. Caldwell (In re Caldwell)*, 851 F.2d 852, 859–860 (6th Cir.1988), the Sixth Circuit reiterated the list of factors set forth in *Okoreeh–Baah* and supplemented that list by enumerating the following four additional considerations:

(1) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code;

(2) good faith does not necessarily require substantial repayment of the unsecured claims;

(3) the fact a debt is nondischargeable under Chapter 7 does not make it nondischargeable under Chapter 13; and

(4) the fact that a debtor seeks to discharge an otherwise nondischargeable debt is not, *per se*, evidence of bad faith but may be considered as part of the totality of the circumstances analysis.

*Caldwell*, 851 F.d at 859–860 (quoting *In re Estus*, 695 F.2d 311, 317 (8th Cir.1982)) (citations omitted).

 As the *Okoreeh–Baah* and *Caldwell* decisions illustrate, a *per se* rule requiring full repayment of obligations arising from questionable or dishonest pre-plan conduct has not been adopted in this Circuit. Rather, a bankruptcy court's good faith analysis must take into account the totality of the circumstances surrounding a debtor's proposed plan. *Okoreeh–Baah*, 836 F.2d at 1033; *Caldwell*, 851 F.2d at 858. Having considered the totality of the circumstances presented in this case, the

Court concludes that Debtor's plan has not been proposed in good faith. There are a number of factors which buttress this conclusion.

■ First, Debtor's prepetition criminal conduct must be characterized as dishonest as opposed to merely questionable.[2] Indeed, Debtor concedes the dishonest nature of his conduct in the Restitution Agreement and Stipulation. Additionally, Debtor's lack of commitment to the letter and spirit of the Criminal Restitution Obligation since his probation terminated nearly two and one-half years may also be characterized as "questionable" pre-plan conduct. For example, Debtor earned in excess of $75,000 in 1987; yet, no voluntary payments to HNB on the Criminal Restitution Obligation were made that year, or since. Debtor cites his ongoing dispute with HNB as his justification for withholding payment. However, this is a make-weight argument. Under the circumstances, it may have been reasonable for Debtor to pay IINB only the amount he claimed was due under the Restitution Agreement. Or, alternatively, Debtor could have made full payments into an escrow account pending resolution of his dispute with HNB. To simply withhold all payment, particularly in view of Debtor's substantial 1987 salary, is strongly suggestive of Debtor's lack of *bona fides* in dealing with HNB. Given Debtor's dishonest conduct in incurring the Criminal Restitution Obligation and his subsequent questionable conduct in dealing therewith, the plan's failure to make full payment of HNB's claim offends 11 U.S.C. § 1325(a)(3)'s good faith requirement.

Yet another factor establishing Debtor's lack of good faith is evidenced by the amount of money he has committed to pay into the plan (*see* discussion, *infra* at 942–43). Quite simply, Debtor has not proposed to commit all of his quarterly commission income to the plan; therefore, compliance with the "disposable income" test of 11 U.S.C. § 1325(b) has not been achieved. This factor, along with the others already mentioned, persuades the Court that the plan is not "a sincerely-intended repayment of [Debtor's] prepetition debt consistent with ... [his] available resources." *Okoreeh–Baah*, 836 F.2d at 1033. The plan also represents an abuse of the spirit of the Bankruptcy Code.

In sum, based upon its consideration of the totality of the circumstances surrounding Debtor's Chapter 13 plan, the Court finds that Debtor's proposal to pay less than a 100% dividend to HNB on its claim is violative of 11 U.S.C. § 1325(a)(3)'s good faith requirement.

### D. *Feasibility*

■ Citing the speculative nature of Debtor's commission income, HNB submits that the Debtor's plan is unfeasible and therefore not in compliance with 11 U.S.C. § 1325(a)(6). The so-called "feasibility" confirmation requirement is contained in 11 U.S.C. § 1325(a)(6), which provides as follows:

> (a) Except as provided in subsection (b), the court shall confirm a plan if—
>
> ....
>
> (6) the debtor will be able to make all payments under the plan and to comply with the plan.

As this Court has previously noted, "[one of] the most important criterion for the confirmation of a Chapter 13 plan ... is the requirement that the court determine whether the Chapter 13 debtor will be able to make all payments under the plan and comply with all other provisions of the plan." *In re Hogue*, 78 B.R. at 872 (Bankr.

---

**2.** The fact that Debtor engaged in prepetition, dishonest conduct does not mandate denial of confirmation and dismissal of the case. Read narrowly, *Memphis Bank* may suggest this result. However, the Court does not believe *Memphis Bank* or its progeny—*Okoreeh–Baah* and *Caldwell*—established such an inflexible rule. Rather, these cases held that the character of a debtor's prepetition conduct is but one factor to be considered in a court's good faith calculus.

*Okoreeh–Baah*, 836 F.2d at 1033. *See also, In re Hughes*, 98 B.R. 784, 789 (Bankr.S.D.Ohio 1989). Here, the unlawful conduct of the Debtor occurred nearly eight years prior to his Chapter 13 filing. Debtor has not resorted to Chapter 13 "within a few days of the wrong," nor has he attempted to "use ... the bankruptcy court to carry out a basically dishonest scheme." *See Memphis Bank*, 692 F.2d at 432.

S.D. Ohio 1987) (quoting 5 *Collier on Bankruptcy* ¶ 1325.07 at 1325–40 (15th ed. 1986)). "[A] Bankruptcy Court must refuse to confirm a Chapter 13 plan if it finds that the debtor will be unable to make all payments under the plan and otherwise comply with the proposed plan." *Id.* A Chapter 13 debtor bears the burden of proving that his plan meets the feasibility requirement of 11 U.S.C. § 1325(a)(6). *In re Olp*, 29 B.R. 932, 936 (Bankr.E.D.Wis. 1983); *Hogue*, 78 B.R. at 872. Here, Debtor failed to meet that burden.

Debtor received no more than $2,200 in commission income for the last quarter of 1988 and has earned no commission income in 1989 through February 21, 1989. In short, Debtor has not demonstrated an ability to produce sufficient income to fund his proposed plan. Hence, Debtor has not met his burden of proving that the plan is feasible.

Debtor cites the following language regarding the feasibility standard in Judge Sellers' recent decision in *In re Compton*, 88 B.R. 166, 167 (Bankr.S.D.Ohio 1988) in support of his contention that the plan satisfies 11 U.S.C. § 1325(a)(6):

> In this Court's experience, Chapter 13 debtors rarely have any reliable guarantee of employment. All that is required for the Court to find that a plan is feasible, where the budget is based upon reasonable, affordable expenses, is that the debtors' expectations of income are sufficiently realistic that they should be given an opportunity to carry out the plan they propose. It has been stated that:
>
> > "A debtor proposing a Chapter 13 plan need not prove that the plan is guaranteed to be successful. Virtually every plan that requires some performance in the future will be subject to a risk factor affecting its successful completion. This Court's judicial discretion is to be exercised, then, to determine at the time of confirmation whether the risk of failure of the proposed plan is impermissible." *In re Anderson*, 18 B.R. 763, 765 (Bankr.S. D.Ohio 1982), *aff'd* 28 B.R. 628 (S.D. Ohio 1982).

While the Court concurs with the foregoing statement in *Compton*, the Debtor's

projected future earnings are so speculative here that his risk of failure is impermissibly great. Accordingly, Debtor's plan does not satisfy the feasibility criterion of 11 U.S.C. § 1325(a)(6).

### E. *The Disposable Income Test*

According to HNB, Debtor's plan fails to comply with the disposable income test of 11 U.S.C. § 1325(b), which provides:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1). Section 1325(b)(1) represents Congress' attempt to resolve statutorily issues relating to the appropriate minimum requirements for funding a Chapter 13 plan from a debtor's post-petition income. *See In re Pierce*, 82 B.R. 874, 879 (Bankr.S.D.Ohio 1987); *In re Navarro*, 83 B.R. 348, 354 (Bankr.E.D.Pa.1988); *In re Stein*, 91 B.R. 796, 799–800 (Bankr.S.D. Ohio 1988); 5 *Collier on Bankruptcy* ¶ 1325.08[1] at 1325–45 to 1325–48 (15th ed. 1988). Pursuant to § 1325(b), if a creditor who will not receive full payment under the plan objects to confirmation, the plan may only be confirmed if the debtor proposes to include all his projected disposable income in the plan for a three-year period.

Debtor's plan violates the disposable income test, HNB submits, in two respects: (1) the plan provides for payment of various obligations of Debtor's wife; and (2) the plan does not call for payment to the Chapter 13 trustee of any commission income which Debtor may earn over and above the $2,700 per quarter level established by the plan. Each of these arguments are considered below.

HNB's initial argument is as follows: Debtor's plan fails the disposable income test because it provides for the payment of various obligations of Debtor's wife—*i.e.*, payments which are not reasonably necessary for the maintenance of Debtor or a dependent of the Debtor. *See* 11 U.S.C. § 1325(b)(2)(A). This argument does not withstand analysis. First, HNB's contention ignores the evidence which was adduced at hearing. The uncontroverted testimony of the Debtor established that, due to his inability to obtain credit, Debtor's residence and automobile are titled in the name of his wife, who is individually responsible for these obligations. In reality, then, Debtor's payment of the obligations in question is reasonably necessary for his maintenance and support: their payment has the effect of providing for Debtor's basic housing and transportation needs. Further, bankruptcy courts applying § 1325(b)'s disposable income test have held that, in determining compliance therewith, a non-filing spouse's income must be included in the debtor's budget. *See, e.g., Matter of Saunders*, 60 B.R. 187, 188 (Bankr.N.D.Ohio 1986). *Cf. In re Sellers*, 33 B.R. 854, 857 (Bankr.D.Colo.1983); *In re Kern*, 40 B.R. 26, 28–29 (Bankr.S.D.N.Y. 1984) (holding that non-filing spouse's income is includible in debtor's budget for purposes of determining whether plan is filed in good faith). It would be anomalous to require inclusion of a non-filing spouse's income in a Chapter 13 debtor's budget for purposes of assessing compliance with the disposable income test and, at the same time, find the payment of the non-filing spouse's individual obligations from the same budget to be impermissible. In short, the fact that Debtor's budget includes an amount for Debtor's wife's debt service is not violative of 11 U.S.C. § 1325(b)'s disposable income test.

The second prong of HNB's disposable income argument is meritorious. According to HNB, Debtor conceivably could earn commission income over and above the amount necessary to pay budgeted expenses and make quarterly plan payments. Unless all of such excess commission income is devoted to the plan, HNB argues, 11 U.S.C. § 1325(b)'s disposable income test is violated. The Court agrees. Prior to the hearing on confirmation, Debtor filed a pleading entitled "Amendment To Debtors Chapter 13 Statement" which states as follows:

> "Debtor's monthly income as set forth in his Chapter 13 Statement is accurate, however, the Chapter 13 Statement as originall [sic] filed fails to disclose that Debtor receives a quarterly commission check in the range of $4,500.00 to $5,000.00 from which his Chapter 13 Plan payments will be deducted."

The above disclosure indicates that, while Debtor expects to receive $4,500 to $5,000 in quarterly commission income over and above his regular salary, only $2,700 per quarter is to be devoted to the plan. Debtor's potential retention of an additional $1,800–$2,300 quarterly in disposable income under the plan violates the mandate of 11 U.S.C. § 1325(b). *Cf. In re Red*, 60 B.R. 113, 116–17 (Bankr.E.D.Tenn.1986). Hence, the plan does not meet the disposable income test of 11 U.S.C. § 1325(b) and confirmation must also be denied on this ground.[3]

F. *Discharge of the Criminal Restitution Obligation*

At the hearing, HNB orally challenged the appropriateness of Debtor's attempt to

---

**3.** Debtor cites Judge Sellers' decision in *In re Wood*, 92 B.R. 264 (Bankr.S.D.Ohio 1988) in support of the proposition that, because Debtor's plan extends beyond 36 months, Debtor may retain the additional $1,800–$2,300 per quarter in excess commission income without violating the disposable income test of 11 U.S.C. § 1325(b). In *Wood,* the court stated as follows: [A]bsent unusual or egregious circumstances, the Court believes that an objection to confirmation based upon the "disposable income test" is not valid if the length of the proposed plan exceeds 36 months, and after the time value of the extended repayment period is considered, the proposed monthly payments to the Trustee produce a significantly higher dividend for general unsecured claimants than would be paid if the objection to confirmation were sustained, all income not reasonably required for support were paid into the plan and the debtors chose to exercise their right to limit such payments to a 36–month period. In other words, the debtors cannot elect to retain disposable income and simply "string out" their payments, but they may

discharge the Criminal Restitution Obligation, arguing that such an obligation is not subject to discharge upon Debtor's successful completion of payments under his plan as proposed. Obviously, having been presented with this argument for the first time at the confirmation hearing, the Debtor did not have adequate time to prepare a response. Because this issue was not properly joined by HNB, and its resolution is not necessary in disposing of the objection to confirmation, it would be inappropriate—and unnecessary—for the Court to rule thereon. Notwithstanding, the Court notes that the bankruptcy court's decision in *Cancel v. City of Schenectady (In re Cancel)*, 82 B.R. 674 (Bankr.N.D.N.Y. 1988), cited by HNB for the proposition that a criminal restitution obligation is not affected by a Chapter 13 discharge, has been reversed. *See Cancel v. City of Schenectady (In re Cancel)*, 85 B.R. 677 (N.D. N.Y.1988). Thus, HNB's reliance on the bankruptcy court's decision in *Cancel* is misplaced. Debtor, on the other hand, submits the Sixth Circuit's decision in *Caldwell* establishes that criminal restitution obligations may be discharged in a Chapter 13 case. But *Caldwell* did not involve a criminal restitution obligation; instead, the issue therein was whether a debt which was nondischargeable in a Chapter 7 case (a civil tort judgment arising from willful and malicious conduct) could be included in a Chapter 13 composition plan without violating 11 U.S.C. § 1325(a)(3)'s good faith standard. Hence, *Caldwell* is clearly inapposite.

Without delving deeper into this issue, the Court will simply note that there are two distinct lines of authority in the bankruptcy courts, a recent court of appeals' decision, and *dictum* in a Supreme Court decision addressing the dischargeability of criminal restitution obligations. *Compare Kelly v. Robinson*, 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216 (1986) (suggesting *in dictum* that criminal restitution obligations do not constitute debts within the meaning of the Bankruptcy Code and, therefore, are not subject to discharge) and *Pellegrino v. Division of Criminal Justice (In re Pellegrino)*, 42 B.R. 129, 132 (Bankr.D.Conn. 1984) (restitution obligations not dischargeable in Chapter 13) with *Pennsylvania Dept. of Public Welfare v. Johnson–Allen (In re Johnson–Allen)*, 871 F.2d 421 (3d Cir.1989) and *Cullens v. District Court (In re Cullens)*, 77 B.R. 825 (Bankr.D.Colo. 1987) (both holding that restitution obligations are debts as defined by the Code and may be discharged in a Chapter 13 proceeding). The parties are certainly not barred from raising this issue at a later date.

Based upon the foregoing, the objection to confirmation of HNB is SUSTAINED. Specifically, to the extent HNB's objection is based upon the plan's noncompliance with 11 U.S.C. §§ 1325(a)(3) (good faith), (a)(6) (feasibility) and (b)(2) (disposable income), the objection is SUSTAINED.

IT IS SO ORDERED.

---

maintain a more comfortable life-style, within reason, if unsecured claimants are not unduly harmed thereby.

92 B.R. at 266. Debtor's reliance on *Wood* is unavailing. Here, Debtor's extension of his repayment period does not result in a significantly higher dividend to unsecured claimholders than would be produced if all of Debtor's disposable income were committed to the plan for 36 months. To the contrary, if all excess quarterly commission income were devoted to the plan, a dividend equal or greater to that proposed could be paid to holders of general, unsecured claims within a 36-month time period.