**In re Michael J.B. HENRY &
Vickie Henry, Debtors.**

**Michael J.B. Henry, et al., Plaintiffs,**

**v.**

**Associates Home Equity Services,
Inc., Defendant.**

**No. LA 97–54348–SB.**

United States Bankruptcy Court,
C.D. California.

Aug. 22, 2001.

John B. Sullivan, Severson & Werson, San Francisco, CA.

Andrew W. Caine, Pachulski, Stang, Ziehl & Young, P.C., Los Angeles, CA.

Randall A. Miller, Kathryn M. Trepinski, Sedgwick, Detert, Moran & Arnold, Los Angeles, CA.

## OPINION

SAMUEL L. BUFFORD, Bankruptcy Judge.

### I. Introduction

The district court has referred to this court the bankruptcy issues in this adversary proceeding, which was filed in that court. After summary judgment proceedings and trial on the merits of the triable issues of fact, the court finds that defendant Associates Home Equity Services, Inc., formerly known as Ford Consumer Finance Co. (collectively referred to herein as "Associates"), violated both the automatic stay and the discharge injunction in the bankruptcy case filed by the debtors in this court.

Because the debtors filed a statement of intention in their bankruptcy case which stated that they intended to keep their home and to make the mortgage payments thereon, the court finds that the secured creditor may reasonably contact

the debtors in writing to determine how the debtors intend to pay their mortgage. However, the court finds that few of the approximately 90 contacts with the debtors after the bankruptcy filing were proper, and that most violated the automatic stay or the discharge injunction.

In consequence, the court finds that the debtors are entitled to recover $6,570 that they paid to Associates after they filed their bankruptcy petition (plus interest). The court further assesses $65,700 in punitive damages against Associates for its intentional violation of the automatic stay and the discharge injunction.

## II. Facts

Debtors Michael and Vicki Henry filed their chapter 7[1] bankruptcy case on November 19, 1997. Unlike more than 30% of the debtors in this district, the Henrys were represented by counsel in their bankruptcy case. Apart from their house, two fully encumbered motor vehicles and an old motorcycle, their only assets of substantial value were two retirement accounts holding some $7600, one of which provided partial security for a $7000 credit union loan. In addition to five undersecured creditors and unpaid real estate taxes, the debtors had a dozen unsecured creditors.

At the time of the bankruptcy filing, Associates held a first mortgage on the debtors' principal residence with a balance of approximately $119,900. It is not clear whether the value of the house[2] exceeded the debt owing to the first mortgage holder. Nonetheless, there were also two junior encumbrances on the property.

Together with their bankruptcy petition, the debtors filed their Statement of Intention, which disclosed that they intended to surrender their 1986 Dodge Ram "upon demand," and that they intended to retain their house, their retirement accounts and their 1994 Chevy Astrovan.

The debtors used an obsolete version of Official Form 8 (which had been replaced effective September 1997, two months before they filed their case) that did not track either the statute or the applicable case law. The form has two categories: "Property To Be Surrendered" and "Property To Be Retained." With respect to property to be retained, the form provides five columns. The first two columns, for the description of the property[3] and the creditor's name, are straightforward. The three remaining are, "Debt will be reaffirmed pursuant to § 524(c)," "Property is claimed as exempt and will be redeemed pursuant to § 722," and "Lien will be avoided pursuant to § 522(f) and property will be claimed as exempt." No entries are made in any of these columns. Instead, the debtors placed an asterisk after the name of each creditor in the second column, and a line at the bottom of the form that said, " *Debtors are current & continuing payments." With their petition the debtors also filed a "Declaration of Debtor(s) re: Performance under 11

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 (West 1999) and to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

2. The exact value of the property at the time of the bankruptcy case is undetermined. On Schedule A the debtors stated that their property was worth $140,000 at the time of filing. Approximately nine months after the foreclosure sale, Associates resold the property for $105,000.

3. The entries that the debtors made in the first column are not simply the property at issue, but the loans as well. On the first line, for example, they list "1st TD on residence." The second and third trust deeds are listed separately. Nobody appears to have been confused by these entries.

U.S.C. § 521(2)(A) and (B)," which stated that they had complied with these provisions. In fact, the parties agree that the debtors were in default for approximately two payments on their first mortgage on their date of filing.

Curiously, the debtors did not claim that their home was exempt property. Their Form 6, Schedule C ("Property Claimed as Exempt") only lists personal property, two retirement plans, and two small bank accounts. Apparently the debtors did not think it necessary to claim an exemption in their house, because on Schedule A (Real Property) they stated that its equity was $2,304, and that after $11,200 in costs of sale (8% of its fair market value) there was no net equity. *See Soost v. NAH, Inc. (In re Soost)*, 262 B.R. 68, 71–74 (8th Cir. BAP 2001) (holding that, where debtors claimed a $1.00 exemption in real property, the excess equity is property of the estate available for distribution to creditors).

The debtors' chapter 7 case was uneventful. After the meeting of creditors, the trustee filed a no-asset report, and the case was closed on March 17, 1998, a week after the discharge was entered.

The debtors received their discharge on March 9, 1998. The discharge order states in part: "All creditors whose debts are discharged by this order ... are enjoined from instituting or continuing any action or employing any process or engaging in any act to collect such debts as personal liabilities of the above-named debtor." [4]

After the bankruptcy filing, the debtors made the following mortgage payments to Associates:

| | |
|---|---|
| 11/29/97 | $1,300 |
| 1/30/98 | 1,230 |
| 2/28/98 | 400 |
| 3/5/98 | 1,240 |
| 4/98 | 1,200 |
| 5/29/98 | 1,200 |

Ultimately, Associates foreclosed on the debtors' house on November 17, 1998 because the debtors were unable to make their post-bankruptcy payments. In this case Associates purchased the debtor's property at the eventual foreclosure sale [5], and resold it for $105,000 nine months later. The debtors moved out of the house on January 15, 1999.

## III. Analysis

The district court has referred six issues for this court to determine in connection with the plaintiffs' class action:

1. Whether Defendant's collection activities violated the automatic stay under § 362 of the Code?

2. Whether Defendant's collection activities violated § 524(a)(2) of the Code and the related bankruptcy discharge?

3. Whether Defendant's failure to take reasonable steps to reaffirm prepetition debt was a deliberate circumvention of § 524(c) of the Code?

4. Whether Defendant's actions constitute civil contempt for violations of the automatic stay under § 362 and § 524(a)(2) of the Code and the related Bankruptcy discharge?

---

4. This language in the discharge order is not necessary. The content of a bankruptcy discharge, including the discharge injunction, is specified by statute. *See* § 524(a). The order includes some, but not all, of the statutory provisions.

5. While a foreclosure sale is normally a public event, in the vast majority of cases the lender purchases the property with its credit bid. This is especially so in a state like California, where virtually all foreclosure sales are conducted without a court proceeding pursuant to a power of sale, which prohibits a deficiency debt. *See* CAL. CIV. CODE § 2924–2924.3 (West 2001).

5. Whether Defendant violated any other provisions of the Code?

6. Whether Defendant is liable to Plaintiffs for any damages, sanctions, and costs associated with violations of the Code and the amount of such liability?

The district court retained for itself, and did not refer to this court, matters relating to class-wide discovery, class certification, and matters relating to claims for violations of RICO and the Fair Debt Collection Practices Act. The district court stayed all of the matters that it retained pending this court's determination of the referred issues.

## A. Automatic Stay Violations— § 362

### 1. Applicable Law

■ Upon the filing of a bankruptcy case, § 362(a) imposes an automatic stay on all creditor collection activities against the debtor. It provides in part: "[A] petition filed under section 301, 302 or 303 . . . operates as a stay, applicable to all entities, of . . . (4) any act to create, perfect, or enforce any lien against property of the estate; . . . (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title . . . ." The Senate Report on § 362, when it was enacted in 1978, begins:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. *It stops all collection efforts, all harassment,* and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

S. Rep. No. 95–989, at 54–55 (1979) (emphasis added). While § 362(b) provides eighteen categories of exceptions to the automatic stay, Associates makes no claim that it qualifies for any exception.

■ Functionally the automatic stay is a combination of a temporary restraining order and a preliminary injunction. It prohibits creditors from engaging in collection activities against a debtor for a limited period of time. The automatic stay differs from a temporary restraining order and a preliminary injunction in six ways: (1) it is automatic upon the filing of a bankruptcy petition and does not require a court order; (2) a debtor is not required to carry any burden of proof or provide any level of evidence to obtain it; (3) a creditor is not entitled to be heard, or even to be given notice, before it is imposed; (4) it requires no bond; (5) it is binding on all creditors, whether or not they have notice of it, and lack of notice is chiefly a defense to punitive damages.

Finally, the automatic stay and the discharge injunction are statutory, and are the same in every bankruptcy case filed in every court in the United States. *Walls v. Wells Fargo Bank (In re Walls),* 262 B.R., 519, 528 (Bankr.E.D.Cal.2001). Their extent does not depend on individual orders fashioned by individual bankruptcy judges. *Id.*

■ The Ninth Circuit has addressed the impact of the automatic stay on numerous occasions. For example, it has recently stated:

> The stay is self-executing, effective upon the filing of the bankruptcy petition, and sweeps broadly, enjoining the commencement or continuation of any judicial, administrative or other proceedings against the debtor, enforcement of prior judgments, perfection of liens, and *any act to collect, assess or recover a claim against the debtor* that arose before the commencement of the case.

*McCarthy, Johnson & Miller v. North Bay Plumbing, Inc. (In re Pettit),* 217 F.3d

1072, 1077 (9th Cir.2000) (emphasis added, citations and internal quotations omitted). The automatic stay is designed to give the bankruptcy court an opportunity to harmonize the interests of both debtor and creditors while preserving the debtor's assets for repayment and reorganization of his or her obligations. *Id.* In addition, "[s]ection 362(a) provides that all collection activities taken or suits brought against a debtor must cease when he or she files for bankruptcy." *Berg v. Good Samaritan Hospital (In re Berg),* 230 F.3d 1165, 1167 (9th Cir.2000); *see also Ramirez v. Fuselier (In re Ramirez),* 183 B.R. 583, 591 (9th Cir. BAP 1995) ("Creditors and their agents must immediately *stop* all collection and enforcement actions affecting the debtor or property of the estate. If there is any question about the applicability or scope of the stay, the creditors are required to come to the bankruptcy court to obtain clarification or relief from the stay." (concurring opinion of J. Fenning, emphasis in original)).

■ If a debtor is represented by counsel, any creditor may communicate with counsel for the debtor without violating the automatic stay. Counsel has no need to be shielded from a client's creditors. It is part of the job of counsel for a debtor to deal with the client's creditors.

Section 362 provides for motions for relief from the automatic stay, and sets very tight time frames for the court to act on such a motions. However, in this case Associates never applied for relief from the automatic stay.

## 2. Notice to Associates of the Henrys' Bankruptcy Filing

■ The court finds that Associates received notice of the debtors' bankruptcy filing on several occasions prior to the February 23, 1998 date when Associates concedes that it knew of the filing.

First, Associates was listed on the creditor matrix under its prior name, Ford Consumer Finance. In consequence, on November 27, 1997 (Thanksgiving Day) the Bankruptcy Noticing Center in Arlington, Virginia mailed a notice of the filing to Associates, which presumably received the notice on approximately December 1, 1997.

Associates complains that the notice was not sent to its correct address. The notice was addressed to Ford Consumer Finance at 23046 Avenida Carlota, Suite 200, Laguna Hills, CA. While Associates' main address was Suite 100 on Avenida de la Carlota, Suite 200 was part of its offices there. The difference between "Avenida Carlota" and "Avenida de la Carlota" is not significant, in the court's judgment.[6]

In addition, the return address on notices to creditors is counsel for the debtor (if the debtor is represented by counsel). The notice was not returned to debtors' bankruptcy counsel. The court concludes that Associates received this notice.

Thus the presumption of receipt applies. *See Moody v. Bucknum (In re Bucknum),* 951 F.2d 204, 206–07 (9th Cir.1991). The presumption that notices were properly mailed and therefore received can only be rebutted by clear and convincing evidence that the mailing was not, in fact, accomplished. *See id.* at 207. The court finds that Associates has not presented evidence sufficient to overcome this presumption.

Second, on November 28, 1997 Vicki Henry went to Associates' Torrance office to make a payment on her mortgage. While at the office, she placed a telephone

**6.** A computer search of MapQuest discloses no "Carlota" street in Laguna Hills apart from Avenida de la Carlota.

call to an Associates collector to inform that office that she had made the payment. At the same time, she provided the information that the debtors had filed a bankruptcy case. Further, she advised Associates to contact the debtors' bankruptcy attorney about the status of the home loan.

Third, in January, 1998 Vicki Henry spoke with a man in the collection department at Associates, who acknowledged that Associates was aware of the Henry bankruptcy case. This conversation took place on either January 21 or January 28—Associates' records show calls from her on both dates. Fourth, on February 4, 1998 Associates received a report from Trans–Union Credit Bureau that contained information about the debtors' bankruptcy case.[7]

Furthermore, Associates began talking with Mrs. Henry about an extension agreement on February 3, 1998, and these discussions continued through the month. According to Associates' evidence, these agreements were only used for bankrupt debtors.

Thus Associates received notice of the Henry's bankruptcy case within a few days of the filing, and repeatedly thereafter. However, Associates had no standard procedure for recording this information in its files so that it would be brought to the attention of an agent responsible for collecting an account.

### 3. Collection Actions by Associates

It is clear that Associates violated the automatic stay on numerous occasions in this case. Notwithstanding the notices received shortly after the Henrys filed their bankruptcy case, Associates attempted to contact the debtors or did contact them some 90 times over the next seven months about the debt.[8] Associates made telephone calls to the debtors both at home and at work, left telephone messages, threatened action if the debtors did not make payments, and sent delinquency letters. Most of the contacts were made or attempted by telephone. Approximately half of the contacts were attempted during the time that the automatic stay was in force,[9] and the remaining half occurred after the discharge injunction replaced the automatic stay. Even though the debtors were represented by counsel, apparently Associates made no attempt even once to contact their counsel. The volume of telephone calls alone compels a finding that Associates was harassing the debtors in violation of the automatic stay and the discharge injunction.

Apparently most of the attempted contacts were unsuccessful: Associates claims that its representatives actually talked to one of the debtors nine times during the automatic stay, and four more after the discharge injunction was issued. In consequence of Associates' collection efforts, the debtors made six postpetition payments to Associates totaling more than $6000.[10]

---

7. Associates contends that it should not be held responsible for this information because it was likely received by the sales department, probably in connection with a request for refinancing, and not by the collection department. The automatic stay does not recognize such compartmentalization of a creditor—notice to an entity is notice.

8. Debtors contend that Associates tried to contact them 94 times during this period. Associates generally concedes the contacts and attempted contacts, but disagrees as to the purpose or content of some of the contacts.

9. Associates concedes only that seven of the pre-discharge contacts were made after it was informed of the filing of the debtors' bankruptcy case. The court finds that notice to Associates predated almost all of these contacts.

10. Debtors contend that they paid $6570, and Associates contend that they received $6170.

## 4. Debtors' Intentions

Associates contends that its contacts with debtors were justified, at least in part, as an effort to determine the debtors' intentions with respect to the loan secured by a mortgage on their real estate. Where an individual debtor files a chapter 7 case and the schedules include a consumer debt secured by property of the debtor, § 521(2) gives the debtor 30 days to file "a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property." In this case the debtors filed this statement with their chapter 7 petition.

■ Where a debtor files the statement of intention within the statutory period, there is no need for the secured creditor to contact the debtor to determine what the debtor's intentions are with respect to the property. This is especially true where, as in this case, the statement is filed with the bankruptcy petition itself. The creditor can determine the debtor's intentions from the papers filed with the court, and has no need to contact the debtor whatsoever on this subject. In this manner the creditor can avoid a violation of the automatic stay.

Associates' personnel responsible for the collection of accounts testified repeatedly that they were trained to call debtors, after bankruptcy cases were filed, to find out their intentions with respect to property. This was highly inappropriate. Where a debtor has filed a statement of intentions, no such calls are necessary or

appropriate: the court record gives all the information to which a creditor is entitled.

## 5. Creditor Contacts Where Debtor Intends to Make Payments

A secured creditor should be encouraged to send out payment coupons, envelopes and periodic statements if a debtor has filed a statement that the debtor plans to keep property subject to secured debt and to make payments. Debtors frequently complain to the court that they want to make their payments, but their creditors do not cooperate by providing payment coupons. Secured creditors hesitate to provide such cooperation for fear of violating the automatic stay or the discharge injunction.

■ Debtors frequently file bankruptcy cases to discharge their unsecured debt, but they want to keep property subject to secured debt, and to repay arrearages on the secured debt. Indeed, chapter 13 provides a variation on this theme: under a chapter 13 plan, the debtor repays arrearages on secured debt over the plan period (typically three to five years), and repays whatever the debtor can afford to pay (if anything) on the unsecured debts. Often a chapter 13 plan will provide for the cure of arrearages on secured debt and the maintenance of current payments, but nothing is left to pay unsecured creditors. *See, e.g., In re Greer,* 60 B.R. 547, 550–56 (Bankr.C.D.Cal.1986). Alternatively, a debtor may file a chapter 7 case to discharge unsecured debt, and then file a chapter 13 plan to deal with the secured debt. *See In re Goeb,* 675 F.2d 1386, 1388–90 (9th Cir.1982); *Greer,* 60 B.R. at 551–54. The secured creditor's consent is not required—a chapter 13 plan is through and through a "cram-down" plan (it is

---

The difference is a $400 payment on February 28, 1998, that the debtors claim they made, and Associates says it did not receive.

crammed down the throats of the unconsenting creditors).[11]

A third variation on this theme, chosen by the debtors in this case, is to file only a chapter 7 case. After discharging the unsecured debts, the debtor is then in position to work out a settlement with the secured creditor that enables the debtor to keep the debtor's house. Often the debtor owes prepetition arrearages on the house, and needs to do a deal with the secured creditor to pay the arrearages. Unlike the chapter 13 route (with or without a prior chapter 7 case to discharge the unsecured debt), where the creditors' consent is not required, this variation on the theme requires that the debtor arrange a deal with the secured creditor to pay the arrearages.

■ Where an individual consumer chapter 7 debtor's statement of intention indicates that the debtor intends to make payments and to keep property that is subject to a lien, such as the mortgage [12] on the real estate in this case, the creditor may properly initiate certain contacts with the debtor. It is proper, for example, for the secured creditor to send monthly statements to the debtor after the bankruptcy filing, and payment coupons or other means to facilitate the making of monthly postpetition payments by the debtor. *See Morgan Guaranty Trust Co. v. American Savings & Loan Ass'n,* 804 F.2d 1487, 1491 (9th Cir.1986). If the promissory note has an adjustable interest rate [13] (as it did in this case), the creditor may properly give notice of changes in the interest rate.

■ If the debtor defaults in making postpetition payments,[14] the creditor may properly give notice thereof, and any other notices that are appropriate and customary in connection with lien enforcement action based on the postpetition default.[15] Further, if there are arrearages in payments at the time of filing, the creditor may properly contact the debtor to arrange for the payment or refinancing of the arrearages.[16] However, the creditor may not use a monthly statement to collect anything more than current payments. *See In re Draper,* 237 B.R. 502, 504–06 (Bankr.M.D.Fla.1999). In contrast, such conduct would violate the automatic stay for any unsecured debts, or any secured debts as to which the debtor does not

**11.** A creditor is given an opportunity to object to the confirmation of a chapter 13 plan. However, the grounds for effective objection are quite limited, and are far from a substitute for a scheme requiring creditor consent.

**12.** The court does not address the situation where a lien at issue is a judgment lien or other non-consensual lien. Such a case would be different from that before the court.

**13.** Even though personal liability on the note is discharged, the rate of interest (and any adjustments thereof) is relevant to determining whether payments are current, or there is a default that authorizes the creditor to foreclose.

**14.** Under California law, a secured creditor has no right to commence foreclosure proceedings unless the debtor is in default. *See*

Cal. Civ. Code § 2924 (West 2001). Thus, if the debtor's payments to a secured creditor are current at the time of the bankruptcy filing, the creditor has a right to commence foreclosure proceedings only for a postpetition default.

**15.** In addition, the creditor may properly contact the debtor to ask the debtor to sign a reaffirmation agreement. *See Bassett v. American Gen. Fin., Inc.* 255 B.R. 747, 758 (9th Cir. BAP 2000); *In re Duke,* 79 F.3d 43, 45 (7th Cir.1996).

**16.** Associates sought an extension agreement from the debtors in this case, and the debtors executed such an agreement after the discharge was entered. Apparently Associates never consented to the agreement, and no copy of the agreement (or even a form of the document) has been produced in this case.

indicate in the Statement of Intention that the debtor intends to keep the property.

■ Proper communications in this context initiated by a creditor are limited to written communications. One benefit of a written communication is that it creates a record which permits the evaluation of whether the communication was proper, and did not stray into improper collection activities.[17]

■ Throughout this process, the creditor may properly respond to any inquiries initiated by the debtor. Any communication that is initiated by the debtor is not a violation of the automatic stay or the discharge injunction, insofar as the creditor responds to the inquiry. If a debtor calls, the creditor is both entitled to take the call, and to call back if necessary to provide the information requested. However, the creditor should not use such a call as an occasion for collection activities.

■ Few of the 47 contacts that Associates made or attempted before the expiration of the automatic stay were justified on any of these grounds. The appropriate contacts included sending three billing statements and one telephone call concerning a check that failed to clear. Each of the remaining contacts, including all of the remaining telephone calls, violated the automatic stay.

## B. Discharge Injunction Violations— § 524(a)(2)

■ The automatic stay in a bankruptcy case does not last indefinitely. In a chapter 7 case for an individual, the automatic stay terminates when a discharge is granted or denied. In this case the discharge was granted on March 9, 1998. Upon the grant of a discharge, the automatic stay is replaced with the discharge injunction provided by § 524(a).

The discharge injunction provision relevant to this case is § 524(a)(2), which provides that a bankruptcy discharge "operates as an injunction against . . . an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . ." *See Molloy v. Primus Automotive Fin. Servs.,* 247 B.R. 804, 815 (C.D.Cal.2000).

■ The discharge injunction is permanent. It survives the bankruptcy case, and applies forever with respect to every debt that is discharged. Again, the Senate Report explains the impact of the injunction:

> The injunction is to give complete effect to the discharge and to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts. This paragraph . . . cover[s] any act to collect, such as dunning by telephone or letter, or indirectly through friends, relatives, or employers, harassment, threats of repossession and the like.

S. REP. No. 95–989, at 182–83 (1979). The permanency of the discharge injunction contrasts with the temporary character of the automatic stay.

---

17. As the Supreme Court has observed in another context, if the debtor does not want to receive or read a communication, the "short, though regular, journey from mail box to trash can . . . is an acceptable burden . . . ." *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 72, 103 S.Ct. 2875, 2883, 77 L.Ed.2d 469 (1983) (citations omitted).

■ At the same time, the discharge injunction is narrower than the automatic stay in a material way for this litigation. While the automatic stay prohibits essentially all creditor collection activities absent court order, the discharge injunction is more selective.

■ Although the discharge eliminates a debt as a personal liability, it does not affect a lien that provides security for the debt. *See* § 522(c)(2). Indeed, the law has been settled since 1886 that a discharge in a liquidation bankruptcy case (a chapter 7 case under present law) does not discharge a lien against real or personal property: liens survive or pass through bankruptcy unaffected. *See, e.g., Johnson v. Home State Bank,* 501 U.S. 78, 83, 111 S.Ct. 2150, 2153, 115 L.Ed.2d 66 (1991); *Long v. Bullard,* 117 U.S. 617, 620, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886).[18] The Supreme Court expressed the principle as follows in *Johnson:* "Notwithstanding the discharge, the [secured creditor]'s right to proceed against [the debtor] *in rem* survived the Chapter 7 liquidation." 501 U.S. at 80, 111 S.Ct. 2150.

■ *Johnson* dealt with the question of whether ·a debtor can reorganize a secured debt under chapter 13 after having discharged it in a chapter 7 case. As a prelude to answering this question, the Supreme Court described the nature of the security interest that survives a chapter 7 liquidation as follows:

A mortgage is an interest in real property that secures a creditor's right to repayment. But unless the debtor and creditor have provided otherwise, the creditor ordinarily is not limited to foreclosure on the mortgaged property should the debtor default on his obligation; rather, the creditor may in addition sue to establish the debtor's in personam liability for any deficiency on the debt and may enforce any judgment against the debtor's assets generally. A defaulting debtor can protect himself from personal liability by obtaining a discharge in a Chapter 7 liquidation. However, such a discharge extinguishes only the personal liability of the debtor. Codifying the rule of *Long v. Bullard,* the Code provides that a creditor's right to foreclose on the mortgage survives or passes through the bankruptcy.

*Id.* at 83, 111 S.Ct. 2150 (citations omitted); *cf. Cox v. Zale Delaware, Inc.,* 239 F.3d 910, 914 (7th Cir.2001) (the effect of rescinding a reaffirmation agreement as to a secured debt is that the debt is discharged but the creditor retains its security interest). A chapter 7 discharge extinguishes only one mode of enforcing a claim, an action *in personam* against the debtor. It leaves intact the right to proceed *in rem* against the property. *Johnson,* 501 U.S. at 84, 111 S.Ct. 2150.

■ This difference is reflected in the statutory scope of the automatic stay and the discharge injunction. While the automatic stay prohibits any act to enforce a lien against property of the estate, there is no comparable provision in the discharge injunction. Thus the bankruptcy discharge eliminates the personal liability of the debtors on the debt, and converts the loan into a non-recourse loan. *See id.* at 86–87, 111 S.Ct. 2150. However, the lien on the property remains, and the creditor may proceed to enforce the lien, to the extent authorized by state law, once the

---

**18.** In *Long* the lien survived because the Bankruptcy Act of 1867, § 20 provided that secured debts were not provable, except to the extent of a deficiency. *See* An Act to establish a uniform System of Bankruptcy throughout the United States, ch. 176, § 20, 14 Stat. 517 (1867) (repealed 1878). While under Bankruptcy Code § 101(5) a secured claim can now be made, the principle remains valid.

automatic stay terminates (whether by operation of law or by order of the court).

A non-recourse loan is a well-known situation in real property law. In practical terms, whether a purchaser of encumbered property assumes a loan or not is of little consequence under California Law: if the purchaser fails to make the loan payments (notwithstanding the lack of assumption), the creditor is entitled to proceed with foreclosure.

 If the debtor wants to make the payments and keep the property, the creditor is entitled to take the same steps to facilitate this arrangement as under the automatic stay (see *supra*) without violating § 524. The creditor may accept payments until (a) the debtor notifies that the debtor no longer desires to make the periodic payments, (b) the obligation is paid in full, or (c) the debtor ceases to own the property.

 If the debtor thereafter defaults, the secured creditor is entitled to enforce its lien by foreclosing on the property, and may give all notices to the debtor authorized by state foreclosure law. The creditor may also give written notice to the debtor that it is planning to proceed with foreclosure because of the post-discharge default.[19]

 Section 524 provides an exception to the discharge injunction for any debt that is reaffirmed pursuant to the procedure provided in that section. The reaffirmation of a debt restores the rights of the creditors in full, and permits enforcement of the debt in case of any post-reaffirmation default. In this case the debtors did not reaffirm the debt owing to Associates. Thus the discharge prohibited Associates from undertaking any debt collection actions thereafter, except to enforce its lien (which was not discharged).

## C. Reaffirmation of Mortgage Debt

 Section 524(c)-(e) provides for the reaffirmation of dischargeable debts in certain circumstances. A reaffirmation of a debt is a purely voluntary act by a debtor, and is not required by any law. *See* Bankruptcy Code § 524(c)(2)(B); *Rein v. Providian Financial Corp.*, 252 F.3d 1095, 1098 (9th Cir.2001); *see generally In re Kamps*, 217 B.R. 836, 840–42 (Bankr. C.D.Cal.1998) (discussing nature of reaffirmation agreement) and cases cited therein. The circuits are split, however, on the consequences of the failure to reaffirm a secured debt.

The disagreement turns on the interpretation of the language of § 521(2). This subsection provides:

> if an individual debtor's schedule of assets and liabilities includes consumer debts which are secured by property of the estate—
>
> (A) within thirty days after the date of the filing of a petition under chapter 7 of this title or on or before the date of the meeting of creditors, whichever is earlier, ... the debtor shall file with the clerk a statement of his intention with respect to the retention or surrender of such property and, if applicable, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property;
>
> (B) within forty-five days after the filing of a notice of intent under this section, or within such additional time as

---

19. Associates contends that its policy for dealing with a default after the replacement of the automatic stay with the discharge injunction was to send the customer a brief letter notifying the debtor of the default, and thereafter to proceed with foreclosure. Such conduct would be appropriate. However, this is not what Associates did in this case.

the court, for cause, within such forty-five day period fixes, the debtor shall perform his intention with respect to such property, as specified by subparagraph (A) of this paragraph; and

(C) nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title
. . . .

Under § 521(2)(A), an individual debtor is required to file a statement of intention, within 30 days of filing a chapter 7 petition, with respect to any consumer debt secured by property of the estate. The debtors in this case filed this statement with their petition, and in it they stated that they intended to retain their house.

The circuits are divided as to the meaning of the remainder of § 521(2)(A). Four circuits (the First, Fifth, Seventh, and Eleventh) have held that, once the debtor decides to retain rather than surrender the property, the debtor must choose one of three options: (1) claim the property as exempt, (2) redeem the property, or (3) reaffirm the debt secured by the property. *See Bank of Boston v. Burr (In re Burr)*, 160 F.3d 843, 845–49 (1st Cir.1998); *Johnson v. Sun Fin. Co. (In re Johnson)*, 89 F.3d 249, 252 (5th Cir.1996) *(per curiam)*; *Taylor v. AGE Fed. Credit Union (In re Taylor)*, 3 F.3d 1512, 1516 (11th Cir.1993); *In re Edwards*, 901 F.2d 1383, 1387 (7th Cir.1990).

In contrast, the Second, Fourth and Tenth circuits hold that a debtor may choose one (or more) of these options "if applicable." However, under the case law of these circuits, a debtor who is current on loan payments on secured property may retain the property and make the payments specified in the contract with the

creditor without choosing any of these options. *Capital Communications Fed. Credit Union v. Boodrow (In re Boodrow)*, 126 F.3d 43, 53 (2d Cir.1997); *Home Owners Funding Corp. v. Belanger (In re Belanger )*, 962 F.2d 345, 347 (4th Cir.1992); *Lowry Fed. Credit Union v. West*, 882 F.2d 1543, 1547 (10th Cir.1989).

In *McClellan v. Parker (In re Parker)*, 139 F.3d 668 (9th Cir.1998), the Ninth Circuit joined the Second, Fourth and Tenth Circuits in holding that a debtor may choose to keep the property and make the payments required by the contract with the creditor. In the Ninth Circuit's view, § 521(2)(C) preserves options for a debtor apart from those specified in § 521(2)(A), which include keeping the property and making the payments on the debt secured thereby. *See id.* at 673. In *Parker* the Ninth Circuit found that the bankruptcy court had discretion to refuse approval of a reaffirmation of a debt secured by the debtor's automobile as not in the debtor's best interest. *See id.* Ninth Circuit law thus permits a bankruptcy judge to deny a debtor permission to reaffirm a secured debt, even where the debtor attempts a reaffirmation, after the debtor chooses to keep the property and make the payments.[20] Perforce, a debtor may make this decision without violating bankruptcy law.

Because in *Parker* the Ninth Circuit approved the option, exercised by the debtors in this case, of retaining property subject to a security interest and making the payments on the secured debt without reaffirming the debt, the court finds that the debtors did not circumvent the provisions of § 524(c), deliberately or otherwise.

---

**20.** Notably, if the debtors in this case had claimed the property as exempt (which they clearly could have done under California law), the court would not have been required to take up *Parker* and the issue under § 521(2)(A) that has divided the circuits.

## D. Civil Contempt

There are at least two different grounds for imposing sanctions for the violation of § 362(a) and 524(a). First, both §§ 362(a) and 524(a) operate as injunctions against creditors, and a violation of either provision is punishable as contempt of court. Second, § 362(h) provides a separate statutory basis for imposing sanctions in appropriate cases. Third, there may be a private right of action for violation of the discharge injunction under § 524.

### 1. Contempt

■ A bankruptcy court may award damages for a violation of the automatic stay or the discharge injunction under the court's contempt power. *State Bd. of Equalization v. Taxel (In re Del Mission Ltd.)*, 98 F.3d 1147, 1152 (9th Cir.1996) (automatic stay). Under Ninth Circuit law, such an award is supported by § 105, which authorizes a bankruptcy court to issue "any order ... that is necessary or appropriate to carry out the provisions of this title." *Id.*

■ Damages are a recognized sanction for contempt. *See, e.g., Costa v. Welch (In re Costa)*, 172 B.R. 954, 963 (Bankr.E.D.Cal.1994) (§ 524 case). The purpose of sanctions for civil contempt is to compensate the opposing party for the injuries which arise from the contempt. *Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725, 731 (9th Cir.1987); *Crystal Palace Gambling Hall, Inc. v. Mark Twain Indus., Inc. (In re Crystal Palace Gambling Hall, Inc.)*, 817 F.2d 1361, 1366 (9th Cir.1987); *Costa*, 172 B.R. at 963. Such an award is limited to the actual loss sustained. *Crystal Palace*, 817 F.2d at 1366. Actual damages are broadly construed to embrace consequential damages and include attorneys' fees incurred in the civil contempt proceeding. *Superior*

*Propane v. Zartun (In re Zartun)*, 30 B.R. 543, 546 (9th Cir. BAP 1983); Jane P. Mallor, *Punitive Attorneys' Fees for Abuse of the Judicial System*, 61 N.C. L.Rev. 613, 620–21 (1983).

■ Under Ninth Circuit law, contempt need not be willful. *See, e.g., Crystal Palace*, 817 F.2d at 1365; *Perry v. O'Donnell*, 759 F.2d 702, 704–06 (9th Cir. 1985). However, a party's inability to comply with a judicial order constitutes a defense to a charge of civil contempt. *See United States v. Rylander*, 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983) ("While the court is bound by the enforcement order, it will not be blind to evidence that compliance is now factually impossible. Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action."); *FTC v. Affordable Media*, 179 F.3d 1228, 1239 (9th Cir.1999). There is no good faith exception to the requirement of obedience to a court order. *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1323 (9th Cir.1998).

■ A violation of the automatic stay is punishable by contempt, even where § 362(h) does not apply. *See, e.g., Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 620 (9th Cir.1993); *Computer Communications*, 824 F.2d at 731; *In re Sielaff*, 164 B.R. 560, 568 (Bankr.W.D.Mich.1994) (finding that civil contempt and § 362(h) provide alternate grounds for imposing sanctions where the debtor is an individual).

■ The bankruptcy discharge operates as a permanent injunction against all attempts by a creditor to collect a discharged debt. *See, e.g., Costa v. Welch (In re Costa)*, 172 B.R. 954, 963 (Bankr. E.D.Cal.1994). In this case, there was also a specific court order enjoining all creditors (including Associates) from "in-

stituting or continuing any action or employing any process or engaging in any act to collect [any prepetition] debts as personal liabilities of the ... debtor[s]." Associates violated both the statutory discharge injunction and the specific discharge order in this case.

Thus Associates violated both the automatic stay and the discharge injunction. Associates does not contest the authority of the court to impose contempt sanctions for these violations.

### 2. Liability under § 362(h)

■■■ Entirely separate from the contempt power, § 362(h) authorizes the imposition of sanctions for willful violations of the automatic stay, where the debtor is an individual. There is no provision under § 524 analogous to § 362(h).

Section 362(h) provides:

An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

A recovery under this section is available only to individual debtors, a condition that is satisfied in this case.

■■■ For the purposes of § 362(h), the Ninth Circuit has defined "willful" as follows:

A "willful violation" does not require a specific intent to violate the automatic stay. Rather, the statute provides for damages upon a finding that the defendant knew of the automatic stay and that the defendant's actions which violated the stay were intentional. Whether the party believes in good faith that it had a right to [take the action it did] is

not relevant to whether the act was "willful" or whether compensation must be awarded.

*Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 191 (9th Cir.1995)

■■■ The only meaningful difference between awarding damages under § 362(h), as opposed to damages for contempt, is that relief under § 362 is mandatory, while relief under contempt is discretionary. *California Employment Dev. Dep't v. Taxel (In re Del Mission Ltd.)*, 98 F.3d 1147, 1152–53 (9th Cir.1996); *Pace*, 67 F.3d at 193. Damages awarded under § 362(h) are statutory damages, not damages based on contempt.[21] *See Ramirez v. Fuselier (In re Ramirez)*, 183 B.R. 583, 589 (9th Cir. BAP 1995), *appeal dismissed*, 201 F.3d 444, 1999 WL 831916 (9th Cir. 1999) (awarding damages under § 362(h) at time when Ninth Circuit case law denied contempt power to bankruptcy courts).

■■■ The court finds that the actions by Associates after November 28, 1997 were willful, for contempt purposes. Associates learned on that date that the debtors had filed a bankruptcy case, invoking the automatic stay. Nonetheless, Associates thereafter undertook many direct, harassing, coercive collection efforts toward plaintiffs during the automatic stay. These collection actions between November 28, 1997 and March 9, 1998 (when the discharge was entered and the automatic stay was replaced with the discharge injunction) were willful, within the meaning of § 362(h). Thus its actions in violation of the automatic stay give rise to a right to recover under § 362(h).

---

**21.** A bankruptcy court may award damages for a violation of the automatic stay under its contempt powers, even apart from § 362(h).

*California Employment Dev. Dep't v. Taxel (In re Del Mission Ltd.)*, 98 F.3d 1147, 1152 (9th Cir.1996).

### 3. Private Right of Action

Plaintiffs contend that they are entitled to damages under a private right of action for Associates' violation of § 524. Associates, in contrast, contends that plaintiffs may only recover under contempt of court for violation of the discharge injunction. It is not clear that there is any practical difference between the two theories insofar as the debtors are concerned. However, the difference may be important in the district court's determination whether to certify a class of plaintiffs.

It does not appear that the district court has referred the issue of a private right of action under § 524 to this court for determination. The district court has asked this court to determine whether Associates' actions constitute civil contempt for violations of either § 362 or § 524(a)(2). The district court has also asked this court to determine whether Associates is liable for any damages, sanctions and costs associated with any violations of the Code, and the amount of such liability. Finally, the district court has asked this court to determine whether Associates has violated any other provisions of the Bankruptcy Code.

This court does not interpret the order of reference to include a determination as to whether there is a private right of action under § 524. The court notes conflicting authority in the Ninth Circuit on this issue. A published opinion by District Judge Howard Matz of this district finds that § 524 creates a private right of action for its violation. *See Molloy v. Primus Automotive Fin. Servs.*, 247 B.R. 804, 815–20 (C.D.Cal.2000) (discussing published opinions). In contrast, the Ninth Circuit Bankruptcy Appellate Panel has held that there is no such private right of action. *See Bassett v. American Gen. Fin., Inc.*, 255 B.R. 747, 753–57 (9th Cir. BAP 2000).

 Normally this court would consider itself bound by the decision of the Bankruptcy Appellate Panel. *See Coyne v. Westinghouse Credit Corp. (In re Globe Illumination Co.)*, 149 B.R. 614, 617–21 (Bankr.C.D.Cal.1993). Under this rule, *Bassett* would compel a determination that § 524 creates no private right of action. However, it is conventional wisdom in the Ninth Circuit, supported by dictum from the circuit court itself, that district judges are not bound by Bankruptcy Appellate Panel precedent. *See Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir.1990) (stating, "it must be conceded that B.A.P. decisions cannot bind the district courts themselves.") Under this view, the district court in this case is free to adopt the view that Judge Matz expressed in *Molloy* permitting a private right of action.

Because this is a district court case, referred to this court only to decide certain specific issues, it is not clear how the bankruptcy court should decide this issue if it were referred to this court for decision. This problem is avoided by leaving this issue to the district court, as the district court itself appears to have done.

### E. Other Bankruptcy Code Violations

The debtors have not claimed that Associates has violated any Bankruptcy Code provisions apart from §§ 362 and 524(a)(2).

### F. Damages, Sanctions and Costs

Because the court has found that Associates has violated both the automatic stay and the discharge injunction, the court must determine the measure of damages, including punitive damages, that plaintiffs are entitled to recover. The court must also assess whether plaintiffs are entitled to recover attorneys fees and costs, and the amount thereof.

The court must address separately the damages, sanctions and costs under § 362

and those under § 524. Section 362(h) mandates the imposition of damages for a willful violation of § 362 where the debtor is an individual. In contrast, § 524 has no explicit provision for damages. The debtors may also recover under the court's contempt powers for the violations of both statutory provisions.

### 1. Compensatory Damages

#### a. Damages Under § 362(h)

 As to actual damages, the debtors made payments to Associates of $6,570 between the date of their bankruptcy filing and January, 1999 when they moved out after the foreclosure by Associates. The debtors paid $4,170 to Associates during the automatic stay, and $2,400 after the discharge injunction took effect.

The court finds that the Henrys' compensatory damages under § 362(h) include the $4,170 that they paid after the bankruptcy case was filed and before the discharge was entered. *See Houseworth v. Three Rivers Federal Credit Union*, 177 B.R. 557, 559 (Bankr.N.D.Ohio 1994) (awarding damages in the amount of postpetition payments on automobile loan). In addition, the court finds that the Henrys are entitled to interest at the legal rate from the date of payment.

#### b. Compensatory Damages for Contempt

As to the automatic stay, compensatory damages for contempt coincide with the damages for violation of § 362(h). Thus the court awards the same damages, including interest, for Associates' contemptuous conduct in violation of the automatic stay as the court has awarded *supra* for the violation of § 362(h).

 The damages for Associates' contemptuous conduct in violation of the discharge injunction include the remaining $2,400 plus interest that the Henrys paid to Associates after the discharge was entered.

#### c. "Special Benefit" Rule

Associates contends that, in consequence of returning Associates' telephone calls, promising payments, and making a few payments, the debtors were able to retain their home with no mortgage payments for a much longer time than they could have otherwise, and thus that they suffered no damage. After moving out, the debtors rented other living quarters for $995 per month. The monthly payments owed by the debtors to Associates were variable, in the range of $1200 to $1500 per month. Associates contends that this is a special benefit that the debtors obtained in consequence of their negotiations with Associates.

Associates invokes Restatement (Second) of Torts, which states the rule as follows: "When the defendant's tortious conduct has caused harm to the plaintiff or to his property and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable." RESTATEMENT (SECOND) OF TORTS, § 920; *see also Turpin v. Sortini*, 31 Cal.3d 220, 182 Cal.Rptr. 337, 347, 643 P.2d 954 (1982) (applying rule).

 The "special benefit" rule is not applicable in this case. This is not a tort case—it is a contempt of court case. Associates has brought no authority to the court's attention that applies the rule to mitigate damages resulting from contempt of court. In addition, Associates fails to quantify how long it would have taken to foreclose absent its illegal behavior, and it has the burden of proof on this issue. Thus the court can make no finding that the debtors received any special benefit

from the alleged delay in foreclosure. Furthermore, after the discharge injunction Associates received all that it was entitled to—the value of the collateral upon foreclosure.

Finally, it would be entirely improper to permit Associates to profit from its own wrong. If the special benefit rule were otherwise applicable, the court would be required to find it inequitable to apply it because of Associates' contempt of court. More specifically, it would be improper to permit a creditor to retain funds obtained in violation of § 362 and § 524. *See Malone v. Norwest Fin. Cal., Inc.*, 245 B.R. 389, 395 (E.D.Cal.2000).

**2. Costs and Reasonable Attorneys Fees**

 Under § 362(h), the damages recoverable include costs and reasonable attorneys fees. *See In re Novak*, 223 B.R. 363, 366 (Bankr.M.D.Fla.1997) (awarding reasonable attorneys fees for automatic stay violation). The amount of reasonable attorneys fees and costs remains to be determined.

**3. Punitive Damages**

 This is clearly a proper case for the imposition of punitive damages for the violation of the automatic stay and the discharge injunction. Punitive damages are an adjunct to compensatory damages in civil litigation.[22] Because the basis for awarding punitive damages under § 524 differs from that under § 362, I consider each separately.

**a. Legal Theory for Punitive Damages**

 Section 362(h) specifically directs courts to grant punitive damages "in ap-

propriate circumstances." *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 228 (9th Cir.1989). A debtor entitled to damages under § 362(h) does not automatically qualify for punitive damages. The court must decide whether the circumstances of the particular case are appropriate for punitive damages.

 Under Ninth Circuit law, a court should be reluctant to award punitive damages under § 362(h) absent some showing of reckless or callous disregard for the law or the rights of others. *Bloom*, 875 F.2d at 228. An award of punitive damages should be determined by the gravity of the offense and set at a level sufficient to assure that it will punish and deter. *Novak*, 223 B.R. at 368. A creditor's good faith or lack thereof is relevant to sanctions under § 362(h). *Walls v. Wells Fargo Bank (In re Walls)*, 262 B.R. 519, 529 (Bankr.E.D.Cal.2001).

 Unlike § 362, § 524 does not have an explicit provision for punitive damages. Nonetheless, such sanctions may be imposed for a willful violation of § 524. *See Novak, supra,* 223 B.R. at 367–68. The test for willfulness under § 524 is the same as that under § 362(h). *See id.* at 367. Again, a relevant consideration is the creditor's good faith or lack thereof. *See Walls*, 262 B.R. at 529.

**b. Factual Basis for Punitive Damages**

In this case, despite notice of the automatic stay and the discharge injunction, Associates callously disregarded its obligations thereunder and continued calling

---

**22.** I disagree with the learned judge in *Costa v. Welch (In re Costa)*, 172 B.R. 954, 963 (Bankr.E.D.Cal.1994), who found that punitive damages are criminal in nature. Criminal sanctions may include fines and other penalties which are almost always payable to the state. In contrast, punitive damages, like compensatory damages, are payable to the prevailing party.

the debtors on very frequent occasions, just as if the bankruptcy case had not been filed, in an attempt to collect the debt. This conduct was wanton and oppressive.

Associates argues that it acted in good faith in an uncertain legal arena. The court finds that the facts do not support this claim. If Associates had made only a handful of contacts with the debtor, perhaps it could have sustained this contention. But the gross number of attempted contacts puts Associates far out of range.

In assessing punitive damages, plaintiffs request this court to find that the automatic stay violations by Associates were common to an identifiable class, that the debtors were typical members of that class in this respect, and that there are no circumstances relating to the debtors that are unique to them. The court notes that these issues are prerequisites to the certification of an action as a class action under Rule 23(a) of the Federal Rules of Civil Procedure. The district court has reserved the issues of class certification, and has not referred them to this court for decision.

### c. Amount of Punitive Damages

▮ In determining the appropriate amount of punitive damages, the court is entitled to consider a defendant's policies, practice and procedures, and its efforts to assure that its conduct complies with the requirements of law. *See Novak, supra,* 223 B.R. at 368. An award of punitive damages should be based on the gravity of the offense and set at a level sufficient to insure that it will punish and deter. *Id.* In this case, the court can consider the efforts of Associates to assure that it complied with the automatic stay and the discharge injunction.

In late 1995, Associates adopted a written policy against contacting a bankrupt customer without prior approval of the customer's attorney. However, this policy was not communicated to its collection personnel in the Western Division, and played no role in the collection process in late 1997 and 1998.

In late 1997 and 1998 Associates had no effective policy to assure that its collection personnel complied with either the automatic stay or the discharge injunction. Associates had no standard procedure during this time for entering information into a customer's account or bringing it to the attention of the appropriate personnel when Associates was informed that a customer had filed bankruptcy. Even after information about a bankruptcy filing was entered into the computer data base, Associates continued to make improper contacts with bankruptcy customers.[23] Indeed, many of the improper contacts with the debtors in this case were made after Associates' file was coded to indicate that the debtors had filed a bankruptcy petition. In addition, although the debtors were represented by counsel in their bankruptcy case, Associates made no effort to contact debtors' counsel.

Furthermore, Associates had no system to assure that its files were properly coded when it in fact received notice of a bankruptcy filing. Indeed, in this case it failed to code the file until three months after it was notified of the bankruptcy filing. Furthermore, this coding had no discernible impact on its continuing collection activities.

Associates argues that the court should be lenient with it because it moved its servicing center from Laguna Hills, Cali-

---

**23.** Associates' June 4, 1998 report disclosed that its personnel had improper contacts with bankruptcy customers in 20 out of 75 ran-

domly selected files (27%), even after the files had been coded to indicate that the customers had filed bankruptcy.

fornia to Phoenix, Arizona at the end of 1997, and that 83% of the Phoenix employees were new to Associates. In effect, Associates closed down its California center and opened a new one with new personnel in Phoenix. These new employees were not properly trained, if they were trained at all, in the proper procedures after a customer filed a bankruptcy case. Associates apparently gave this problem no attention until June 1998, when an audit showed massive non-compliance with Associates' own policies. It took a lengthy period of time thereafter before Associates established substantial compliance with its legal obligations as to the automatic stay and the discharge injunction.

These circumstances do not excuse the massive violations of the automatic stay and the discharge injunction in this case. Indeed, they show a massive lack of training by Associates and lack of concern about its employees' respecting the legal rights of its customers. Punitive damages should be assessed in an appropriate amount to deter such conduct. At the same time, the damages should recognize that eventually Associates did address the problems.

The court concludes that, in contrast to its written policy, Associates' actual policy at the times relevant hereto was to ignore a bankruptcy filing by a customer in all respects except, (1) eventually to put a flag in its account records of the bankruptcy filing, and (2) to add to its collection efforts an attempt to obtain an "extension agreement" from the customer. Such a policy by a major credit provider to ignore the automatic stay and the discharge injunction is an "appropriate case" for the imposition of punitive damages. *See In re Novak*, 223 B.R. 363, 367–68.

Based on these factors, the court awards punitive damages to the plaintiffs in the amount of $ 65,700.

## IV. Conclusion

The court concludes that Associates has engaged in egregious willful conduct in this case in violation of the automatic stay and the discharge injunction. Accordingly, it awards compensatory damages in the amount of $ 6,570 plus interest and punitive damages in the amount of $ 65,700. Attorneys fees and costs remain to be determined.